

FILED

2012 OCT 19  A II: 02

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1   FRANCIS M. GREGOREK (144785)
    gregorek@whafh.com
2   RACHELE R. RICKERT (190634)
    rickert@whafh.com
3   WOLF HALDENSTEIN ADLER
      FREEMAN & HERZ LLP
4   750 B Street, Suite 2770
    San Diego, CA 92101
5   Telephone: 619/239-4599
    Facsimile: 619/234-4599
6
    MARK C. RIFKIN
7   rifkin@whafh.com
    ALEXANDER H. SCHMIDT
8   schmidt@whafh.com
    MICHAEL LISKOW (243899)
9   liskow@whafh.com
    WOLF HALDENSTEIN ADLER
10     FREEMAN & HERZ LLP
    270 Madison Avenue
11  New York, NY 10016
    Telephone: 212/545-4600
12  Facsimile: 212/545-4677
13
    Counsel for Plaintiffs
14
    [Additional Counsel Appear On Signature Page]
15
                   UNITED STATES DISTRICT COURT
16
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
17
                      SAN FRANSICO DIVISION
18
19  ZACK WARD and THOMAS          )  CASE NO. 12    5404
    BUCHAR, on behalf of themselves )
20  and all others similarly situated, )                    JCS
                                   )
21              Plaintiffs,        )  CLASS ACTION COMPLAINT
                                   )
22          v.                     )
                                   )
23                                 )  DEMAND FOR JURY TRIAL
    APPLE INC.,                    )
24                                 )
                Defendant.         )
25                                 )
26
27
28

    CLASS ACTION COMPLAINT

1    Plaintiffs Zack Ward and Thomas Buchar ("Plaintiffs"), for their class action complaint,
2    allege upon personal knowledge as to themselves and their own actions, and upon information and
3    belief, including the investigation of counsel, as follows:

4                                    **NATURE OF ACTION**

5    1.    This is an antitrust class action pursuant to section 2 of the Sherman Antitrust Act
6    of 1890, 15 U.S.C. § 2 (2004) (the "Sherman Act"), brought by Plaintiffs on their own behalf and
7    on behalf of a class of persons similarly situated, those being persons who purchased an Apple
8    iPhone from Defendant Apple Inc. ("Apple") or non-party AT&T Mobility, LLC ("ATTM"), or
9    elsewhere, and then purchased wireless voice and data services for the iPhone from October 19,
10   2008, through February 3, 2011 (the "Class Period")

11   **A.    Summary Of Material Facts**

12   2.    Apple launched its iPhone on or about June 29, 2007.  Prior to launch, Apple
13   entered into a secret five-year contract with ATTM that established ATTM as the exclusive
14   provider of cell phone voice and data services for iPhone customers through some time in 2012
15   ("Exclusivity Agreement"). As part of the contract, Apple shared in ATTM's revenues and profits
16   with respect to the first generation of iPhones launched, known as the iPhone 2G, which was a
17   unique arrangement in the industry.  The Plaintiffs and other class members who purchased
18   iPhones did not agree to use ATTM for five years.  Apple's undisclosed five-year Exclusivity
19   Agreement with ATTM, however, effectively locked iPhone users into using ATTM for five
20   years, contrary to those users' knowledge, wishes and expectations.

21   3.    To enforce ATTM's exclusivity, Apple, among other things, programmed and
22   installed software locks on each iPhone it sold that prevented the purchaser from switching to
23   another carrier that competed with ATTM in the cell phone voice and data services industry.
24   Under an exemption to the Digital Millennium Copyright Act of 1998, 17 U.S.C. § 1201, *et seq.*
25   (2008) (the "DMCA"), cell phone consumers have an absolute legal right to modify their phones
26   to use the network of their carrier of choice.  Apple has prevented iPhone customers from
27   exercising that legal right by locking the iPhones and refusing to give customers the software
28   codes needed to unlock them.

CLASS ACTION COMPLAINT

- 1 -

1        4.      Under its Exclusivity Agreement with ATTM, Apple retained exclusive control

2 over the design, features and operating software for the iPhone, including the code that "locks"

3 iPhones to the ATTM network.

4        5.      Through these actions, Apple has unlawfully stifled competition, reduced output

5 and consumer choice, and artificially increased prices in the aftermarkets for iPhone voice and

6 data services.

7 **B.**    **Summary Of Claims**

8        6.      In pursuit and furtherance of its unlawful anticompetitive activities, Apple:

9 (a) failed to obtain iPhone consumers' contractual consent to the five-year Exclusivity Agreement

10 between Apple and ATTM, the effect of which was to lock consumers into using ATTM as their

11 voice and data service provider, even if they wished to discontinue their use of ATTM service;

12 (b) failed to obtain iPhone consumers' contractual consent to having their iPhones "locked" to

13 only accept ATTM Subscriber Identity Modules ("SIM cards"), thereby preventing iPhone

14 purchasers from using any cell phone voice and data service provider other than ATTM; (c) and

15 failed to obtain iPhone consumers' contractual consent to make unavailable to them the "unlock

16 code" that would enable the consumers to use a service other than ATTM, even though ATTM

17 routinely provides such unlock codes for other types of cell phones.

18        7.      Apple violated section 2 of the Sherman Act by conspiring with ATTM to

19 monopolize the aftermarket for voice and data services for iPhones in a manner that harmed

20 competition and injured consumers by reducing output and increasing prices in that aftermarket.

21        8.      Plaintiffs seek declaratory and injunctive relief, treble and exemplary damages,

22 costs and attorneys' fees. As for equitable relief, Plaintiffs seek an order: (a) restraining Apple

23 from selling iPhones that are programmed in any way to prevent or hinder consumers from

24 unlocking their SIM cards; (b) requiring Apple to provide the iPhone SIM unlock codes to

25 members of the class and other iPhone consumers immediately upon request; and (c) restraining

26 Apple from selling or distributing locked iPhones without adequately disclosing the fact that they

27 are locked to work only with ATTM SIM cards and without obtaining the consumers' contractual

28

CLASS ACTION COMPLAINT

- 2 -

1  consent to have their iPhones locked.[1]

2  **THE PARTIES**

3  9.    Plaintiff Zack Ward is an individual residing in Los Angeles County, California

4  who, in or about October 2009, purchased an iPhone and paid for ATTM voice and data service

5  for his iPhone at ATTM's stated rates during the Class Period.

6  10.    Plaintiff Thomas Buchar is an individual residing in Chicago, Illinois who, in or

7  about June 2009, purchased an iPhone and paid for ATTM voice and data service for his iPhone at

8  ATTM's stated rates during the Class Period.

9  11.    Defendant Apple is a California corporation with its principal place of business

10  located at 1 Infinite Loop, Cupertino, California 95014.  Apple regularly conducts and transacts

11  business in this District, as well as throughout the United States.  Apple manufactures, markets,

12  and sells the iPhone, among other electronic devices.

13  **JURISDICTION AND VENUE**

14  12.    This Court has federal question jurisdiction pursuant to the Sherman Act, the

15  Clayton Antitrust Act of 1914, 15 U.S.C. § 15 and pursuant to 28 U.S.C. §§ 1331 and 1337.

16  13.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because

17  sufficient diversity of citizenship exists between parties in this action, the aggregate amount in

18  controversy exceeds $5,000,000, and there are 100 or more members of the proposed class.

19  14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Apple has its

20  principal place of business in this District, a substantial part of the events or omissions giving rise

21  to Plaintiffs' claims occurred here, and Apple is a corporation subject to personal jurisdiction in

22  this District and, therefore, resides here for venue purposes.

23  15.    To activate their iPhones, each Plaintiff and each member of the Class was required

24

---

[1]    Apple has released six models of the iPhone to date.  From the earliest to most recent, the

25  models are the iPhone 2G, the iPhone 3G, the iPhone 3GS, the iPhone 4, the iPhone 4S and the

26  iPhone 5.  Apple created the first three iPhones to operate only on the ATTM wireless network, as
part of the Exclusivity Agreement.  One version of the iPhone 4 is locked to work only on

27  ATTM's network, while another version, which was released on February 3, 2011, works on
Verizon's (defined *infra*) network.  The iPhone 4S and iPhone 5 are designed to be able to operate

28  on *any* domestic carrier's network.

CLASS ACTION COMPLAINT

- 3 -

1 to and did agree to bring any claims against Apple, such as the claims asserted herein, in court in

2 California.

3                                        **FACTUAL ALLEGATIONS**

4    **A.    Plaintiffs' Injuries**

5        16.    In Spring 2007, Apple began a massive advertising campaign to market its new

6 wireless communication device, the iPhone. The iPhone was advertised as a mobile phone, iPod

7 and "breakthrough" Internet communications device with desktop-class email, an "industry first"

8 "visual voicemail," web browsing, maps and searching capability.

9        17.    The iPhone debuted on June 29, 2007, and despite its hefty $499 or $599 price tag,[2]

10 consumers waited in line to get their hands on one.

11        18.    Pursuant to the secret Exclusivity Agreement between Apple and ATTM described

12 more fully below, during the Class Period the iPhone was sold at both Apple's and ATTM's retail

13 and online stores, among other places.

14        19.    Apple and ATTM entered into a five-year exclusive service provider agreement,

15 which on information and belief was originally scheduled to expire in 2012, although it appears to

16 have been terminated early by Apple before February 2011, when Verizon began selling voice and

17 data service for the iPhone.

18        20.    Each Plaintiff purchased one or more iPhones. Each Plaintiff also purchased

19 wireless voice and data services from ATTM for their iPhones.

20        21.    Prior to Plaintiffs' purchases of their iPhones and ATTM voice and data services,

21 Apple had not even disclosed – much less obtained the Plaintiffs' contractual consent to – either:

22 (a) the existence of Apple's five-year Exclusivity Agreement with ATTM; or (b) that Apple's

23 five-year agreement would effectively lock Plaintiffs into using ATTM as their voice and data

24 service provider for the duration of the five-year agreement. In fact, neither Apple's nor ATTM's

25 sales or customer service representatives were told about the length of the secret Exclusivity

26 Agreement.

27        22.    Prior to Plaintiffs' purchases of their iPhones and voice and data service, Apple had

28 _____
   [2]     Initially, the 4GB iPhone 2G retailed for $499 and the 8GB iPhone 2G retailed for $599.

CLASS ACTION COMPLAINT

                                                                                    - 4 -

1  not disclosed – much less obtained Plaintiffs' contractual consent to – the fact: (a) that Plaintiffs'
2  iPhones were locked to only work with ATTM SIM cards; or (b) that the unlock codes would not
3  be provided to them on request.

4      23.    On information and belief, ATTM provides unlock codes for cell phones other than
5  the iPhone if requested by a consumer.

6      24.    Plaintiff Ward wanted to have the option of switching his iPhone service to a
7  competing domestic voice and data service provider other than ATTM.

8      25.    Plaintiff Buchar wanted to have the option of switching his iPhone service to a
9  competing domestic voice and data service provider other than ATTM.

10      26.    Plaintiff Buchar wanted to have the ability to unlock his iPhone SIM card for
11  international travel and to switch his iPhone service to a local voice and data service provider
12  while roaming.

13  **B.    The Cell Phone Industry**

14      27.    Cellular telephone service began to be offered to consumers in 1983. Cellular
15  telephones operate using radio frequency channels allocated by the Federal Communications
16  Commission ("FCC"). Geographical service areas, sometimes known as "cells," are serviced by
17  base stations using low-power radio telephone equipment, sometimes known as "cell towers."
18  The cell towers connect to a Mobile Telephone Switching Office ("MTSO"), which controls the
19  switching between cell phones and land line phones, accessed through the public-switched
20  telephone network, and to other cell telephones.

21      28.    In cellular service there are two main competing network technologies: Global
22  System for Mobile Communications ("GSM") and Code Division Multiple Access ("CDMA").
23  GSM is the product of an international organization founded in 1987 dedicated to providing,
24  developing, and overseeing a worldwide wireless standard. CDMA is an alternative technological
25  platform, developed by Qualcomm, Inc., used in much of North America and parts of Asia.

26      29.    To enable cell phones to send and receive emails, stream video and provide other
27  services requiring higher data transfer speeds, both CDMA and GSM carriers adopted
28  technologies to comply with what the industry refers to as "3rd or 4th generation," or "3G" or

CLASS ACTION COMPLAINT

- 5 -

1    "4G" standards.  These technologies require the cell phone to operate on a separate 3G or 4G

2    network.  The ATTM services provided to users of the first-generation iPhone were on ATTM's

3    2G network, whereas later versions of the iPhone operate on 3G and 4G networks.

4           30.     While there are a number of cellular phone service providers in the United States,

5    only four have substantial national networks: ATTM, T-Mobile USA, Inc. ("T-Mobile"), Sprint

6    Corporation ("Sprint"), and Cellco Partnership d/b/a Verizon Wireless ("Verizon") (collectively,

7    the "Major Carriers").  Other suppliers may in effect be "resellers" of cellular telephone service

8    which they purchase from the Major Carriers.  ATTM and T-Mobile operate GSM networks,

9    while Sprint and Verizon operate CDMA networks.

10          31.     ATTM and the other wireless carriers have long dominated and controlled the cell

11   phone industry in the United States in a manner that, according to a *Wall Street Journal* article,

12   "severely limits consumer choice, stifles innovation, crushes entrepreneurship, and has made the

13   U.S. the laughingstock of the mobile-technology world, just as the cellphone is morphing into a

14   powerful hand-held computer."  Walter S. Mossberg, *Free My Phone*, WALL STREET JOURNAL,

15   Oct. 22, 2007, at R3, col. 1.

16          32.     Unlike the personal computer market in general – where computer manufacturers

17   and software developers can offer products directly to consumers without having to gain the

18   approval of Internet service providers, and without paying those providers a penny – the wireless

19   carriers have used their ability to grant or deny access to their wireless networks to control both

20   the type of cell phone hardware and software that can be manufactured and to extract payments

21   from manufacturers granted access to their networks and customers.  *Id.*

22          33.     The anticompetitive nature of the wireless telephone market the carriers have

23   created and facilitated gave rise to the commercial context in which Apple was able to commit the

24   wrongs and offenses alleged herein.

25   **C.    The Cell Phone Industry's History Of Misusing Locked SIM Cards**

26          34.     In the United States, as a general rule, only GSM phones use SIM cards.  The

27   removable SIM card allows phones to be instantly activated, interchanged, swapped out and

28   upgraded, all without carrier intervention.  The SIM card itself is tied to the network rather than

CLASS ACTION COMPLAINT

1  the actual phone. Phones that are SIM card-enabled generally can be used with any GSM carrier.

2      35.    Thus, the hardware of all GSM compatible cell phones give consumers some

3  degree of choice to switch among GSM carriers' wireless networks by enabling them to replace

4  their SIM card, a process that the average individual consumer easily can do with no training by

5  following a few simple instructions in a matter of minutes. SIM cards are very inexpensive, now

6  typically costing a few dollars. When the card is changed to the SIM card of another carrier, the

7  cell phone is immediately usable on the other carrier's network. To switch from ATTM to

8  T-Mobile, or the other way around, all that is required is this simple change of the SIM card.

9      36.    For telephone users who travel, particularly to Europe, the ability to change SIM

10  cards to a European carrier such as Orange, Vodaphone or TIM, allows the user of a GSM

11  American phone to "convert it" to a "local" phone in the country where they have traveled.

12  Absent a conversion to local service, a consumer using an American GSM cell phone abroad must

13  pay both for the American service and for "roaming" charges, that is, the right to call or retrieve

14  data from outside of the customer's primary calling area. Roaming charges are typically very

15  high, often a dollar or more a minute. As a result, U.S.-based cell phone users traveling abroad

16  can yield very substantial savings by switching the SIM card and paying for local service rather

17  than using the U.S.-based GSM carrier.

18      37.    In an effort to minimize consumers' ability to switch carriers or avoid roaming

19  charges by simply switching SIM cards, the Major Carriers, acting in concert through trade

20  associations and standards-setting organizations such as the CDMA Development Group, the

21  Telecommunications Industry Association, the Third Generation Partnership Project, the Alliance

22  for Telecommunications, the Open Mobile Alliance, the CSM Association, the Universal Wireless

23  Communications Consortium, and the Cellular Telephone Industry Association, and otherwise,

24  agreed to implement "Programming Lock" features which effectively "locked" individual handsets

25  so that they could not be used without the "unlocking" code. GSM carriers obtain a locking code

26  (normally only six digits long) unique to each cell phone from the cell phone manufacturer.

27  Absent obtaining the unlocking code from their GSM carrier, consumers who purchase a

28  telephone manufactured to work with one of the two GSM Major Carriers can not switch to

CLASS ACTION COMPLAINT

1  another carrier, even temporarily while traveling abroad, without buying an entirely new phone.

2      38.    The two GSM carriers, ATTM and T-Mobile, adopted a SIM-lock standard that
3  locked each GSM phone to a particular SIM card, thereby preventing consumers from simply
4  changing their SIM cards to switch carriers. However, throughout the Class Period both T-Mobile
5  and ATTM (for cell phones other than the iPhone) typically unlocked SIM cards on request for
6  international travel, or even if customers wanted to cancel their accounts and switch to another
7  carrier. In most cases, the unlock code was given on request, almost instantly, over the telephone.

8      39.    Accordingly, ATTM unlocked SIM cards on telephones sold exclusively through
9  them, such as the Blackberry Torch and the Samsung Blackjack. There is but one exception: the
10 iPhone. Even today, ATTM refuses to provide the unlock code for iPhones for international travel
11 or otherwise.[3] That is because, as described more fully below, Apple and ATTM unlawfully
12 agreed as part of the Exclusivity Agreement that the iPhone would not be unlocked under any
13 circumstances.

14 **D.    Apple Knows It Cannot Legally Prevent Consumers From Unlocking iPhones**

15     40.    Several years ago, the Major Carriers were subject to lawsuits that sought to
16 impose liability based on the existence of Program Locks. Carriers had claimed that Program
17 Locks were necessary to protect their copyrighted intellectual property and claimed then, as Apple
18 has done, that the reason for the locks was to benefit consumers and protect against fraud.
19 Carriers had also sought to assert that under the terms of the DMCA, disabling the Program Locks
20 or unlocking a SIM card would be a violation of law.

21     41.    The DMCA was enacted in 1998 to prohibit third parties from circumventing

22
---
23 [3]   Despite the fact that the iPhone 5 can be operated on either a GSM or CDMA network,
ATTM allows customers to unlock their iPhones only if they meet specific criteria, including
24 completing the full term of their service agreement. *See* What are the Eligibility Requirements for
unlocking my iPhone?, http://www.att.com/esupport/article.jsp?sid=KB414532&cv=820#fbid=
25 P8B3TW1-RQ9 (last visited October 18, 2012) (requiring that "All contract obligations, including
any term commitment, associated with the device to be unlocked have been fully satisfied."). By
26 contrast, Verizon's iPhone 5 model is already unlocked when sold to customers. *See*  Kelly
27 Hodgkins, *Verizon's iPhone 5 Ships Unlocked, Likely Thanks to FCC*, TUAW, Sept. 24, 2012,
*available at* http://www.tuaw.com/2012/09/24/verizon-iphone-5-ships-unlocked-likely-thanks-to-
28 fcc/.

CLASS ACTION COMPLAINT

- 8 -

1 technological measures (called "access controls") that copyright owners had employed to control
2 access to their protected intellectual property. However, in November 2006, the Librarian of
3 Congress, who by statute has authority to create exemptions to the restrictions in section 1201 of
4 the DMCA to ensure the public is able to engage in noninfringing uses of copyrighted works,
5 announced a three-year exemption from the prohibition against circumvention of access controls
6 for "[c]omputer programs in the form of firmware that enable wireless telephone handsets to
7 connect to a wireless telephone communication network, when circumvention is accomplished for
8 the sole purpose of lawfully connecting to a wireless telephone communication network." The
9 exemption stemmed from a recommendation by the Register of Copyrights, which concluded that
10 "the access controls [on cell phones] do not appear to actually be deployed in order to protect the
11 interests of the copyright owner or the value or integrity of the copyrighted work; rather, *they are*
12 *used by wireless carriers to limit the ability of subscribers to switch to other carriers, a business*
13 *decision that has nothing whatsoever to do with the interests protected by copyright.*"
14 Exemption to Prohibition of Copyright Protection Systems for Access Control Technologies, 71
15 Fed. Reg. 68472, 68476 (Nov. 27, 2006) (emphasis added).

16     42.     In 2009, the Librarian of Congress extended the initial three-year exemption
17 applicable to cell phone access controls on an interim basis. Exemption to Prohibition of
18 Copyright Protection Systems for Access Control Technologies, 74 Fed. Reg. 55138, 55139 (Oct.
19 27, 2009). On July 27, 2010, the Librarian of Congress issued a final rule to this effect.
20 Exemption to Prohibition of Copyright Protection Systems for Access Control Technologies, 75
21 Fed. Reg. 43825, 43832 (July 27, 2010).

22     43.     Because Apple was unable to enforce its SIM card Program Locks through legal
23 means, it engaged in a scheme to enforce them unlawfully as to the iPhone.

24 **E.     The Apple – ATTM Exclusivity Agreement**

25     44.     On January 9, 2007, a little over a month after the initial adverse Librarian of
26 Congress ruling, Apple announced that it had entered into an exclusive agreement making ATTM
27 the only authorized provider of wireless voice and data services for iPhones in the United States.
28 Apple did not announce that the duration of that exclusive agreement was five years.

CLASS ACTION COMPLAINT

- 9 -

1      45.    While the terms of that Exclusivity Agreement and any related agreements
2  (collectively, the "Agreement") still have not been made public, some rumored details emerged.
3  First, ATTM and Apple agreed to share ATTM's voice service and data service revenue received
4  from iPhone customers. This was a unique arrangement in the industry and gave Apple strong
5  motivation to force iPhone consumers to continue purchasing voice and data services from ATTM
6  for as long as possible.

7      46.    Second, while ATTM offered iPhone purchasers industry standard monthly voice
8  and data service that could be terminated at any time prior to two years for a fee, Apple had
9  secretly agreed to give ATTM iPhone exclusivity for five years, so that iPhone customers would
10  have no choice but to continue purchasing voice and data services from ATTM until sometime in
11  2012 in order for their iPhone to continue to operate – even if the customers wanted to terminate
12  their ATTM service early to switch to a less expensive carrier, such as T-Mobile in the United
13  States.

14      47.    Third, on information and belief, Apple and ATTM agreed to enforce ATTM's
15  exclusivity by installing SIM card Program Locks on all iPhones and agreeing never to disclose
16  the unlock codes to iPhone consumers who wished to replace the iPhone SIM card, either for
17  international travel or to lawfully switch to another carrier.

18      48.    Fourth, the Agreement allowed Apple to control the features, content, software
19  programming and design of the iPhone.

20      49.    Fifth, since both Apple and ATTM recognized that the iPhone would create a
21  unique product for which consumers would pay a premium price compared to other cell phones,
22  the pricing structure of the ATTM exclusivity deal was different than a typical agreement between
23  a carrier and a handset manufacturer. Typically, the carrier subsidizes the purchase price of the
24  handset (that is, sells the cell phone to the consumer at a substantial discount off the list price) in
25  return for the consumer purchasing wireless service from the carrier for a period of time. This
26  arrangement, the carriers argue, benefits the consumer by lowering the cell phone's price. The
27  carriers, however, charge an early termination fee if consumers wish to discontinue their purchase
28  of wireless service prior to the agreed upon length of time, which fee the carriers argue is justified

CLASS ACTION COMPLAINT

1   by their subsidization of the cell phone price. Upon termination, the cell phone customer can

2   obtain cell phone service from any carrier using the same network protocol (*i.e.*, GSM or CDMA).

3       50.     In Apple's and ATTM's Agreement, ATTM did not agree to subsidize the purchase

4   of the iPhone handset initially but nevertheless still charged iPhone consumers a fee for

5   terminating their voice and data service within the first two years. The early termination fee by

6   ATTM was not justifiable absent subsidization of the handset price. The benefits of the

7   termination fee were also illusory because even those iPhone consumers who discontinued their

8   ATTM voice and data services by paying the early termination fee were prevented from obtaining

9   wireless service for their iPhone from one of ATTM's competitors domestically or abroad.

10      51.     Sixth, on information and belief, ATTM and Apple agreed that they would take

11   action, legal or otherwise, to prevent users from circumventing the SIM card locks. A central

12   purpose of this agreement was to suppress lawful competition domestically by T-Mobile against

13   ATTM in the iPhone aftermarket for voice and data services.

14      52.     Finally, on information and belief, Apple and ATTM agreed that Apple would be

15   restrained for a period of time from developing a CDMA version of the iPhone to suppress

16   competition by Sprint and Verizon. Apple and ATTM agreed to this restraint notwithstanding that

17   Apple could easily develop an iPhone for use on CDMA networks. In fact, Apple originally

18   approached Verizon to be the iPhone exclusive service provider before Apple approached ATTM.

19      53.     None of the above details of the Exclusivity Agreement were disclosed to

20   purchasers of the iPhone, by representatives of Apple and ATTM or otherwise. Nor did any

21   iPhone purchaser ever contractually consent to any of those terms upon purchasing their iPhone.

22      54.     After the introduction of the iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S, and

23   iPhone 5, Apple and ATTM have continued to abide by and enforce certain anticompetitive terms

24   of their Agreement, such as the Program Locks and their refusal to give consumers the unlock

25   codes for their iPhones, in order to continue to suppress competition in the voice and data service

26   aftermarket and to continue to enjoy the supracompetitive profits stemming from their Agreement.

27

28

CLASS ACTION COMPLAINT

1  **F.    Apple And ATTM Quickly Faced Unwanted Competition In The iPhone Aftermarkets**

2      55.    Soon after the release of the iPhone 2G, customers began developing methods to

3  unlock the iPhone's SIM card. Initially, some customers sought to evade the program lock by

4  altering the hardware. In August 2007, a high-school student announced the first "hardware

5  unlocked" iPhone on YouTube. Shortly thereafter, software unlocks were developed and an

6  explosion of unlock solutions, both free and for a fee, appeared on the Internet. Many of the

7  solutions involved a small change in the software, in some cases in as little as two bytes of code.

8      56.    The availability of SIM card unlocking solutions enabled iPhone customers to

9  lawfully terminate their ATTM voice and data service if they were unhappy with ATTM's service

10 and switch to T-Mobile in the United States, and it enabled iPhone customers to avoid ATTM's

11 excessive international roaming charges by replacing the ATTM SIM card with a local carrier's

12 SIM card while traveling.

13     57.    The availability of SIM card unlocking solutions reduced ATTM's and Apple's

14 share of the iPhone voice and data services aftermarket and threatened to reduce the supra

15 competitive revenues and profits they conspired to earn.

16                              **CLASS ALLEGATIONS**

17     58.    Plaintiffs bring this action as a class action on behalf of themselves and all others

18 similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis.

19 Plaintiffs' proposed class (hereinafter the "Class") is defined under Federal Rules of Civil

20 Procedure 23(b)(2) and (3), and Plaintiffs propose to act as representatives of the following class

21 comprised of:

22     **All persons, exclusive of Apple and its employees, who purchased an iPhone
       anywhere in the United States at any time, and who then also paid for voice
23     and data service from ATTM during the Class Period.**

24     59.    The Class for whose benefit this action is brought is so numerous that joinder of all

25 members is impractical.

26     60.    Plaintiffs are unable to state the exact number of Class members without discovery

27 of Apple and ATTM's records but, on information and belief, state that tens of millions of iPhones

28 were sold for use on the ATTM network during the Class Period.

CLASS ACTION COMPLAINT

1    61.    There are questions of law and fact common to the Class which predominate over
2    any questions affecting only individual members.    The common questions of law and fact
3    affecting the rights of all members of the Class include the following:

4              a.    Whether Apple failed to obtain consumers' contractual consent to the fact
5                    that Apple had entered into the five-year Exclusivity Agreement with
6                    ATTM whereby consumers would be unable to switch to a competing voice
7                    and data service provider during the period of the Exclusivity Agreement;

8              b.    Whether Apple failed to obtain consumers' contractual consent to the fact
9                    that the iPhones would be locked to only accept ATTM SIM cards;

10             c.    Whether Apple failed to obtain consumers' contractual consent to the fact
11                   that they would not provide consumers with the unlock codes for their
12                   iPhones so that the iPhones could be used with non-ATTM SIM cards; and

13             d.    Whether Apple violated section 2 of the Sherman Act by conspiring to
14                   monopolize the aftermarket for iPhone wireless voice and data services.

15    62.    Each of these enumerated common questions of law and fact is identical for each
16    and every member of the Class.

17    63.    Plaintiffs are members of the Class they seek to represent, and their claims arise
18    from the same factual and legal basis as those of the Class; they assert the same legal theories as
19    do all Class members.

20    64.    Plaintiffs will thoroughly and adequately protect the interests of the Class, having
21    obtained qualified and competent legal counsel to represent themselves and those similarly
22    situated.

23    65.    The prosecution of separate actions by individual Class members would create a
24    risk of inconsistent adjudications and would cause needless expenditure of judicial resources.

25    66.    Plaintiffs are typical of the Class in that their claims, like those of the Class, are
26    based on the same unconscionable business practices and the same legal theories.

27    67.    Apple has acted on grounds generally applicable to the Class.

28

CLASS ACTION COMPLAINT

- 13 -

1      68.    A class action is superior to all other available methods for the fair and efficient

2 adjudication of the controversy.

3 **RELEVANT MARKET ALLEGATIONS**

4      69.    The iPhone is a unique, premium priced product that generates a unique

5 aftermarket for voice and data services that can be used only on iPhones. During at least the Class

6 Period, the price of iPhones was not responsive to an increase in iPhone service because:

7 (a) consumers who purchased an iPhone could not, at the point of sale, reasonably or accurately

8 inform themselves of the "lifecycle costs" (that is, the combined cost of the handset and its

9 required services, parts and applications over the iPhone's lifetime); and (b) consumers were

10 "locked into" the iPhone due to its high price tag and would incur significant costs to switch to

11 another handset. The aftermarket for iPhone voice and data services is thus economically distinct

12 product markets, and the service product that is sold within those markets has no acceptable

13 substitutes. The geographic scope of the iPhone voice and data services aftermarket is national.

14      70.    The relevant aftermarket is the aftermarket for wireless voice and data services (the

15 "iPhone Voice and Data Services Aftermarket").

16      71.    The iPhone Voice and Data Services Aftermarket came into existence immediately

17 upon the sale of the first iPhones, because: (a) the iPhone Voice and Data Services Aftermarket is

18 derivative of the iPhone market; (b) no Plaintiff or member of the Class contractually agreed to

19 permit Apple to impose any restrictions in this aftermarket; (c) the Plaintiffs and members of the

20 Class were entitled to terminate service with ATTM at any time upon payment of a termination

21 fee; and (d) no Plaintiffs or members of the Class agreed with anyone to not purchase and use

22 voice and data services from providers other than ATTM.

23 **COUNT I**
**Conspiracy to Monopolize the iPhone Voice and Data Services Aftermarket**

24 **in Violation of Section 2 of the Sherman Act**
**(Seeking Damages and Equitable Relief)**

25      72.    Plaintiffs reallege and incorporate paragraphs 1 through 71 above as if set forth

26 fully herein.

27      73.    Apple knowingly and intentionally conspired with ATTM with the specific intent

28 to monopolize the iPhone Voice and Data Services Aftermarket. In furtherance of the conspiracy,

CLASS ACTION COMPLAINT

1  Apple and its co-conspirator agreed without Plaintiffs' knowledge or consent to make ATTM the

2  exclusive provider of voice and data services for the iPhone for five years, contrary to Plaintiffs'

3  reasonable expectations that they could switch at any time to another carrier in the first two years

4  that they owned their iPhone after paying the $175 early termination fee, and without charge after

5  that period.

6       74.     ATTM unlawfully achieved an economically significant degree of market power in

7  the iPhone Voice and Data Services Aftermarket as a result of the conspiracy and effectively

8  foreclosed new and potential entrants from entering the market or gaining their naturally

9  competitive market shares.

10      75.     Apple and ATTM's conspiracy reduced output and competition and resulted in

11  increased prices in the iPhone Voice and Data Services Aftermarket and, thus, harmed competition

12  generally in that market.

13      76.     Plaintiffs were injured in fact by Apple and ATTM's conspiracy because they were:

14  (a) deprived of alternatives for voice and data services domestically; and (b) forced to pay

15  supracompetitive prices for iPhone voice and data services.

16      77.     Apple's conspiracy to monopolize the iPhone Voice and Data Services Aftermarket

17  violated Section 2 of the Sherman Act, and its anticompetitive practices are continuing and will

18  continue unless they are permanently enjoined. Plaintiffs and members of the Class have suffered

19  economic injury to their property as a direct and proximate result of Apple's conspiracy, and

20  Apple is therefore liable for treble damages, costs and attorneys' fees in amounts to be proven at

21  trial.

22                          **REQUESTS FOR RELIEF**

23      WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Apple

24  as follows:

25      a.     Permanently enjoining Apple from selling locked iPhones that can only be used

26             with ATTM SIM cards unless such information is adequately disclosed to

27             consumers prior to sale;

28      b.     Ordering Apple to provide the unlock code upon request to all members of the

CLASS ACTION COMPLAINT

1       Class who purchased an iPhone prior to the disclosures described above;

2       c.      Permanently enjoining Apple from conspiring to monopolize the iPhone Voice and

3               Data Services Aftermarket;

4       d.      Awarding Plaintiffs and the Class treble damages for injuries caused by Apple's

5               violations of the federal antitrust laws;

6       e.      Awarding Plaintiffs and the Class reasonable attorneys' fees and costs; and

7       f.      Granting such other and further relief as the Court may deem just and proper.

8                               **DEMAND FOR TRIAL BY JURY**

9       Plaintiffs hereby demand a trial by jury.

10      DATED: October 19, 2012                 WOLF HALDENSTEIN ADLER
                                                FREEMAN & HERZ LLP
11                                              FRANCIS M. GREGOREK
                                                RACHELE R. RICKERT
12
13                                              _____
                                                RACHELE R. RICKERT
14
15                                              750 B Street, Suite 2770
                                                San Diego, CA 92101
16                                              Telephone: 619/239-4599
                                                Facsimile: 619/234-4599
17
                                                WOLF HALDENSTEIN ADLER
18                                                FREEMAN & HERZ LLP
                                                MARK C. RIFKIN
19                                              ALEXANDER H. SCHMIDT
20                                              MICHAEL LISKOW (243899)
                                                270 Madison Avenue
21                                              New York, NY 10016
                                                Telephone: 212/545-4600
22                                              Facsimile: 212/545-4677
23
                                                WOLF HALDENSTEIN ADLER
24                                                FREEMAN & HERZ LLC
                                                ADAM J. LEVITT
25                                              55 West Monroe Street, Suite 1111
26                                              Chicago, IL 60603
                                                Telephone: 312/984-0000
27                                              Facsimile: 312/984-0001
28

        CLASS ACTION COMPLAINT
                                                                                    - 16 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RANDALL S. NEWMAN, P.C.
RANDALL S. NEWMAN, P.C. (190547)
37 Wall Street, Penthouse D
New York, NY 10005
Telephone: 212/797-3737
Facsimile: 212/797-3172

**Counsel for Plaintiffs**

APPLE(WARD):19149.CPT

**CLASS ACTION COMPLAINT**

- 17 -