1  LATHAM & WATKINS LLP
   Daniel M. Wall (Bar No. 102580)
2     Christopher S. Yates (Bar No. 161273)
   Sadik Huseny (Bar No. 224659)
3     Aaron T. Chiu (Bar No. 287788)
   Ana Gardea (Bar No. 280797)
4  505 Montgomery Street, Suite 2000
   San Francisco, CA  94111-6538
5  Telephone:  +1.415.391.0600
   Facsimile:  +1.415.395.8095
6  Email: Dan.Wall@lw.com
   Email: Chris.Yates@lw.com
7  Email: Sadik.Huseny@lw.com
   Email: Aaron.Chiu@lw.com
8  Email: Ana.Gardea@lw.com

9  Attorneys for Defendant
   APPLE INC.

10

11  UNITED STATES DISTRICT COURT

12  NORTHERN DISTRICT OF CALIFORNIA

13  OAKLAND DIVISION

| | |
|---|---|
| 14 ZACK WARD and THOMAS BUCHAR, on behalf of themselves and all others similarly situated, | CASE NO. 4:12-cv-05404-YGR<br>Related to Case No. 4:11-cv-06714-YGR |
| 16            Plaintiffs, | **DEFENDANT APPLE'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| 17     v. | |
| 18 APPLE INC., | |
| 19            Defendant. | Date:  November 10, 2015<br>Time: 2:00 PM<br>Place: Courtroom 1, 4th Floor |
| 21 | The Honorable Yvonne Gonzalez Rogers |

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF ISSUE TO BE DECIDED.................................................... 3

III.  STATEMENT OF FACTS AND PROCEDURAL HISTORY............................ 3

    A.  Plaintiffs' Cause of Action................................................................. 3

    B.  Plaintiffs' Alleged Relevant Market and the Market for Cellular
        Phone Voice and Data Services .......................................................... 4

    C.  Apple and ATTM's Exclusivity Agreement...................................... 4

    D.  Relevant Procedural History .............................................................. 7

IV.  ARGUMENT .................................................................................................... 8

    A.  To Plead a Plausible Section 2 Claim, a Plaintiff Must Allege a
        Cognizable Relevant Market.............................................................. 8

    B.  Plaintiffs' Complaint Is Plainly Deficient Under the Standard Rule
        That a Relevant Market Must Include All Economic Substitutes for
        the Defendant's Product..................................................................... 9

    C.  A Single-Brand Market for iPhone Services Cannot Be Justified on
        the Ground That the iPhone Is "Unique" .......................................... 10

    D.  Plaintiffs Fail to Allege a Cognizable Aftermarket Under *Kodak* ...................... 12

        1.  The Legal Concept of an Aftermarket:  *Kodak*...................................... 12

        2.  Plaintiffs' Alleged "Aftermarket" Is Not Cognizable Under
            *Kodak* and Its Progeny ........................................................... 17

V.  CONCLUSION................................................................................................ 22

# TABLE OF AUTHORITIES

**CASES**

Page(s)

*Adidas America, Inc. v. National Collegiate Athletic Association,*
 64 F. Supp. 2d 1097 (D. Kan. 1999) .............................................................. 11

*Apple, Inc. v. Psystar Corp.,*
 586 F. Supp. 2d 1190 (N.D. Cal. 2008) ......................................................... 17

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ........................................................................................ 9

*AT&T Mobility LLC v. Concepcion,*
 131 S. Ct. 1740 (2011) .................................................................................... 7

*Bell Atlantic Corp. v. Twombly,*
 550 U.S. 544 (2007) ........................................................................................ 9

*Blizzard Entertainment Inc. v. Ceiling Fan Software LLC,*
 941 F. Supp. 2d 1227 (C.D. Cal. 2013) ......................................................... 21

*Brown Shoe v. United States,*
 370 U.S. 294 (1962) ...................................................................................... 10

*Car Carriers v. Ford Motor Co.,*
 745 F.2d 1101 (7th Cir. 1984) ........................................................................ 9

*Commercial Data Servers, Inc. v. International Business Machines Corp.,*
 262 F. Supp. 2d 50 (S.D.N.Y. 2003) ............................................................. 11

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,*
 732 F.2d 480 (5th Cir. 1984) ........................................................................ 11

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
 504 U.S. 451 (1992) ................................................................................ *passim*

*Forsyth v. Humana, Inc.,*
 114 F.3d 1467 (9th Cir. 1997) ...................................................................... 15

*General Business Systems v. North American Philips Corp.,*
 699 F.2d 965 (9th Cir. 1983) ........................................................................ 11

*Harkins Amusement Enterprises, Inc. v. General Cinema Corp.,*
 850 F.2d 477 (9th Cir. 1988) .......................................................................... 8

*Heliotrope General, Inc. v. Ford Motor Co.,*
 189 F.3d 971 (9th Cir. 1999) ........................................................................ 20

*In re Apple & AT&TM Antitrust Litigation,*
 596 F. Supp. 2d 1288 (N.D. Cal. 2008) ......................................................... 7

*In re Apple iPhone Antitrust Litigation,*
 874 F. Supp. 2d 889 (N.D. Cal. 2012) ............................................................ 8

*Lee v. Life Insurance Co. of North America*,
   23 F.3d 14 (1st Cir 1994).................................................................................. 18

*Newcal Industries, Inc. v. IKON Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ................................................................*passim*

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998)........................................................................................ 7

*Oracle America, Inc. v. Terix Computer Co.*,
   No. 5:13-cv-03385, 2014 U.S. Dist. LEXIS 158060 (N.D. Cal. Nov. 7, 2014) ................. 14

*Paladin Associates, Inc. v. Montana Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) ........................................................................ 9

*PSI Repair Services, Inc. v. Honeywell, Inc.*,
   104 F.3d 811 (6th Cir. 1997) ................................................................... 16, 21

*Queen City Pizza v. Domino's Pizza*,
   124 F.3d 430 (3d Cir. 1997)....................................................................... 15, 17, 18

*Redmond v. Missouri Western State College*,
   No. 84-cv-6139, 1988 U.S. Dist. LEXIS 12230 (W.D. Mo. Nov. 2, 1988) ...................... 11

*SmithKline Corp. v. Eli Lilly & Co.*,
   575 F.2d 1056 (3d Cir. 1978)........................................................................ 12

*SMS System Maintenance Services v. Digital Equipment Corp.*,
   188 F.3d 11 (1st Cir. 1999)....................................................................... 13, 21

*Staehr v. The Hartford Financial Services*,
   547 F.3d 406 (2d. Cir. 2008)........................................................................ 20

*Tanaka v. University of Southern California*,
   252 F.3d 1059 (9th Cir. 2001) ...................................................................... 9

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)........................................................................ 9

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
   959 F.2d 468 (3rd Cir. 1992) (en banc) ........................................................ 11

*United States v. American Express Co.*,
   --- F. Supp. 3d ----, 2015 WL 728563 (E.D.N.Y. Feb. 19, 2015)............................ 10

*United States v. E. I. Du Pont de Nemours & Co.*,
   351 U.S. 377 (1956)...................................................................................... 10

*Universal Avionics Systems Corp. v. Rockwell International Corp.*,
   184 F. Supp. 2d 947 (D. Ariz. 2001) ........................................................... 14, 20

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
   578 F.3d 1016 (9th Cir. 2009) ...................................................................... 19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

APPLE'S MOTION TO DISMISS
CASE NO. 4:12-CV-05404-YGR

1

**OTHER AUTHORITIES**

2   Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of* Kodak, 63
3   Antitrust L.J. 483 (1995) ........................................................................................ 17

David A.J. Goldfine & Kenneth M. Vorrassi, *The Fall of the Kodak Aftermarket
4   Doctrine: Dying a Slow Death in the Lower Courts*, 72 Antitrust L.J. 209
5   (2004) ...................................................................................................................... 14

Jonathan I. Gleklen, *The ISO Litigation of* Eastman Kodak Co. v. Image
6   Technical Services: *Twenty Years and Not Much to Show for It*, 27 Antitrust
7   56 (2012) ................................................................................................................. 14

Joshua D. Wright, *Abandoning Antitrust's Chicago Obsession: The Case for
8   Evidence-Based Antitrust*, 78 Antitrust L.J. 301 (2012) ....................................... 14

9   Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
10  Principles and Their Application* (4th ed. 2014) ....................................... 7, 10, 14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION

2          PLEASE TAKE NOTICE THAT on November 10, 2015, at 2:00 p.m., or as soon

3  thereafter as the matter may be heard, in the United States District Court, Northern District of

4  California, Courtroom 1, 4th Floor, at 1301 Clay Street, Oakland, CA 94612, before the

5  Honorable Yvonne Gonzalez Rogers, Defendant Apple Inc. will and hereby does move the Court

6  for an order dismissing Plaintiffs' Class Action Complaint for failure to state a claim under Rule

7  12(b)(6) of the Federal Rules of Civil Procedure.  This motion is based on this Notice of Motion

8  and Motion, the accompanying Memorandum of Points and Authorities, the other documents filed

9  in connection with this motion, the papers and records on file in this action, and such other written

10  and oral argument as may be presented to the Court.

11

## RELIEF SOUGHT

12          Defendant Apple seeks an order dismissing Plaintiffs' Class Action Complaint for failure

13  to state a claim because Plaintiffs do not meet their burden of pleading a relevant market.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    INTRODUCTION**

3      Plaintiffs' claimed relevant market is a litigation artifice and fails as a matter of law.  In the

4    real world, AT&T Mobility ("ATTM") offers voice and data services in competition with Verizon,

5    T-Mobile, Sprint, and other companies.  It is not a monopolist of any kind, including in any

6    "aftermarket" for voice and data services for the iPhone alone.  ATTM does not sell a separate

7    service offering called "voice and data services for the iPhone."  Instead, it sells (and consumers

8    purchase) the same voice and data services no matter the brand of cellular telephone used by the

9    customer.  The same was true in June 2007 when Apple first sold the iPhone, and it was also true

10   in mid- to late-2009 when the two named Plaintiffs in this case are alleged to have purchased

11   iPhones from Apple and voice and data services from ATTM.

12     This case depends entirely on Plaintiffs' contention that "voice and data services for the

13   iPhone" is a distinct antitrust market, falling within the limited "aftermarket" exception first

14   announced in the Supreme Court's *Kodak* opinion.  *Eastman Kodak Co. v. Image Technical*

15   *Services, Inc.*, 504 U.S. 451 (1992) ("*Kodak*").  That is the only way Plaintiffs can put "ATTM"

16   and "monopoly" in the same sentence.  The *Kodak* doctrine, however, is about a unique

17   competitive issue where a manufacturer of a durable good (copiers in that case) that competes with

18   independent service organizations in providing post-sale service excludes competition that it had

19   once encouraged.  The term "aftermarket" is literal:  a service market is an "aftermarket" because

20   consumers buy service *after* they first buy the copier and *after* the expiration of the warranty.  And

21   the Supreme Court's concern was narrow:  because Kodak had a long-standing policy of selling

22   spare parts to independent service organizations, a sudden and unexpected change in that policy

23   could permit it to exploit "locked-in" service customers (*i.e.*, customers who had already

24   purchased Kodak copiers).

25     Nothing like that is alleged to have occurred here.  This case is about the fact that, for a

26   few years, iPhones were not available to consumers except with ATTM service and ATTM would

27   not unlock the iPhone for use on any other carrier's network.  This was not because of any *change*

28   *in policy* as in *Kodak*; exclusive distribution through ATTM was Apple's entry strategy into the

smartphone business and therefore the original business terms offered to iPhone consumers. This means that there can be no *Kodak*-style aftermarket claim as a matter of law. *All* aftermarket cases limit the doctrine to commerce that takes place *after* consumers are locked-in to a product by virtue of an earlier purchase, and then only to cases where the alleged monopolist exploited the consumer's locked-in position with some unforeseen, deceitful, coercive, or fraudulent behavior. A *Kodak*-style aftermarket claim cannot exist where, like here, Plaintiffs affirmatively allege that the claimed aftermarket began instantaneously upon purchase of their iPhones, and complain about conduct that affected consumers from the moment of their initial purchase.

Plaintiffs urge a radical expansion of the *Kodak* doctrine. They allege that since Apple and ATTM did not divulge the precise *length* of their exclusivity agreement, and consumers did not agree *contractually* to use ATTM voice and data services for the entire period of that exclusivity agreement, an aftermarket was created *as a matter of law*. This is a complete distortion of the *Kodak* doctrine—and of the Ninth Circuit's opinion in *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008), which is the only case Plaintiffs cite for this theory. *Newcal* is a true aftermarket case—another one involving copiers and independent service organizations—and in that context it specifically holds that even if a buyer has *not* contractually consented to an aftermarket restriction, if consumers can "reasonably discover" the alleged aftermarket restrictions, there can be no cognizable aftermarket under *Kodak* as a matter of law. *Id.* at 1048.

Here, there is no doubt whatsoever that ATTM has at all times competed with Verizon, Sprint, T-Mobile, and others. There is also no doubt that consumers purchasing iPhones in the Fall of 2008 and thereafter could reasonably discover that ATTM was the exclusive carrier for the iPhone and that ATTM would not unlock the iPhone for use on other cellular networks. Plaintiffs themselves allege that Apple and ATTM trumpeted the fact that the iPhone was available "exclusively" or "only on" ATTM. And numerous judicially noticeable facts confirm this common knowledge. Moreover, named Plaintiff Ward bought his iPhone in October 2009—or more than two years after the iPhone was initially sold—when ATTM was still the exclusive service provider. If there were any doubt, the *iPhone I* litigation—filed mere months after the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  iPhone's launch in 2007—dooms Plaintiffs' claim because it provides conclusive evidence that

2  consumers could "reasonably discover" the challenged aftermarket restrictions—and did.

3      The time has come to end this litigation.  Apple's motion to dismiss should be granted with

4  prejudice because Plaintiffs cannot meet their burden of pleading a cognizable antitrust market.

5  **II.    STATEMENT OF ISSUE TO BE DECIDED**

6      Whether Plaintiffs' single conspiracy-to-monopolize claim must be dismissed for failure to

7  state a claim because Plaintiffs do not meet their burden of pleading a relevant market.

8  **III.   STATEMENT OF FACTS AND PROCEDURAL HISTORY**

9      **A.    Plaintiffs' Cause of Action**

10     Plaintiffs are a putative class of persons who purchased iPhones from Apple, ATTM, or

11 elsewhere and also purchased wireless and data services for their iPhones from ATTM between

12 October 19, 2008, and February 3, 2011.  Compl. ¶ 1.  They assert a single claim against Apple

13 alone under Section 2 of the Sherman Act, alleging that Apple conspired with ATTM to

14 monopolize an "aftermarket" for iPhone voice and data services.  *Id.* ¶ 73.  Specifically, Plaintiffs'

15 theory is that Apple and ATTM entered into a secret five-year exclusivity agreement in early 2007,

16 *id.* ¶¶ 19, 44, and that this agreement, which allegedly was not disclosed or contractually agreed

17 upon by the purported class members, "effectively lock[ed] Plaintiffs into using ATTM as their

18 [iPhone] voice and data service provider for the duration of the five-year agreement," *id.* ¶ 21.

19 According to Plaintiffs, to effectuate this exclusivity agreement, Apple and ATTM agreed to install

20 program locks on the SIM cards in all iPhones and to never release unlock codes.  *Id.* ¶¶ 3, 47.  In

21 other words, Plaintiffs allege that consumers were unable to unlock their iPhones and use them on

22 other cellular networks and were instead required to use their iPhones exclusively on ATTM's

23 wireless network.  This supposed conspiracy allegedly reduced output and competition in a

24 claimed iPhone voice and data services aftermarket and allowed ATTM (but not Apple) to achieve

25 market power in that aftermarket.  *Id.* ¶¶ 74, 75.

26

27

28

**B.    Plaintiffs' Alleged Relevant Market and the Market for Cellular Phone Voice and Data Services**

As with any Sherman Act, Section 2 claim, Plaintiffs must allege a cognizable relevant market.  Plaintiffs allege that the relevant market underlying their claim is "a unique aftermarket for voice and data services that can be used only on iPhones." *Id.* ¶ 69.  This "aftermarket," according to Plaintiffs, is an "economically distinct product market[ ], and the service product that is sold within [that] market[ ] has no acceptable substitutes." *Id.*

It is ATTM, of course, and not Apple, that provides voice and data services for cellular phones, including the iPhone.  ATTM is therefore the alleged "monopolist."  Yet there is no claim that the voice and data services that ATTM offers for iPhones are different than the services it offers for other cellphones.  The alleged monopoly is purely a product of the fact that ATTM had an exclusivity agreement for the iPhone.  In fact, Plaintiffs acknowledge that voice and data services for the iPhone actually exist in a larger market for cellphone voice and data services—a market in which ATTM is only one of many competitors. *See id.* ¶¶ 27-31.  As alleged, there are "a number of cellular phone services providers in the United States" other than ATTM, including T-Mobile, Sprint, and Verizon, which all have "substantial national networks." *Id.* ¶ 30.

There are no allegations that ATTM exploited customers using iPhones by charging them higher rates than those charged to ATTM customers using other smartphones.  Nor are there any allegations that ATTM made an unexpected change in its service policies or pricing *after* customers bought iPhones.

While Apple is the sole defendant in this case, there is no claim that Apple has any monopoly power.  Apple instead competes in the market for making and selling smartphones, which it first entered in June 2007.  It is common knowledge that the smartphone market has always been and remains fiercely competitive, with participants such as Samsung, LG, RIM, Motorola, and Nokia.

**C.    Apple and ATTM's Exclusivity Agreement**

The cornerstone of Plaintiffs' conspiracy-to-monopolize claim is Apple's "secret five-year contract with ATTM that established ATTM as the exclusive provider of cellphone voice and data

1    services for iPhone customers through some time in 2012[.]"  *Id.* ¶ 2.  Plaintiffs disparage this

2    exclusivity agreement as the nucleus of Apple and ATTM's "conspiracy to monopolize" the

3    supposed aftermarket for iPhone voice and data services.  *Id.* ¶¶ 76-77.  Indeed, for all intents and

4    purposes, the exclusivity agreement *is* the alleged conspiracy.  The only concerted action by Apple

5    alleged in the complaint is forming and abiding by this contract.

6         It is hardly unusual for wireless carriers to obtain exclusive distribution rights over

7    particular handsets.  As the Complaint acknowledges, ATTM also had at various times exclusive

8    agreements with two other leading smartphone manufacturers—RIM and Samsung—covering

9    RIM's Blackberry Torch and Samsung's Blackjack.  *See id.* ¶ 39.  And as the Complaint alleges,

10   the exclusivity agreement between Apple and ATTM was never a secret.  *Id.* ¶ 44 ("On January 9,

11   2007"—more than 6 months before the iPhone's launch—"Apple announced that it had entered

12   into an exclusive agreement making ATTM the only authorized provider of wireless voice and

13   data services for iPhones in the United States.").

14        The Complaint only takes issue with whether customers were sufficiently apprised of the

15   extent of the duration of ATTM's exclusive right to the iPhone.[1]  It does not (and Plaintiffs cannot)

16   dispute that the exclusivity agreement and the fact that iPhone customers would need to use ATTM

17   service exclusively, were facts widely disseminated among the public even before the first sale of

18   the iPhone.  By the earliest date relevant to this Complaint, October 19, 2008, the iPhone had been

19   sold for over a year, and was always exclusively available on the ATTM network.  It would have

20   been impossible *not* to know that.  And, the iPhone was still exclusively available on ATTM when

21   Plaintiff Ward bought his iPhone in October 2009—more than two years after the iPhone was first

22   sold.  *Id.* ¶ 9.  Accordingly, the Complaint does not allege and could not allege that any member of

23   the putative class bought an iPhone reasonably expecting a choice of carriers, only to find out later

24   that there wasn't a choice.  This was the indisputable state of affairs until the iPhone was launched

25   on Verizon in February 2011.

26

27   [1] The press release and presentations announcing the iPhone stated that Apple and ATTM had
     entered into a "multi-year" exclusivity agreement or "multi-year" partnership (Request for
28   Judicial Notice, Exs. E-F, H) but Plaintiffs apparently contend that the precise durational terms
     were required to be disclosed.

1       Other judicially noticeable facts make clear that customers were informed of the

2  exclusivity agreement, as well as their inability to unlock their iPhones for use on other cellular

3  carriers.  For example, the label on the iPhone box stated the following:  (1) consumers would be

4  required to obtain iPhone voice and data service from ATTM for the initial two-year contract

5  period; (2) a "[s]ervice plan with AT&T [is] required for cellular network capabilities on

6  expiration of initial new two-year agreement"; and (3) wireless service "is solely provided by"

7  ATTM.  Request for Judicial Notice ("RJN"), Ex. A.  Thus, Apple informed iPhone purchasers

8  that an ATTM wireless service plan would be required for not only the duration of their initial

9  two-year wireless service contract, *but also after that initial two-year contract expired*.  ATTM's

10  Wireless Service Agreement ("WSA"), signed by ATTM iPhone customers, declared that the

11  iPhone was "designed for use exclusively on AT&T's system."  RJN, Ex. B at 12.  ATTM and

12  Apple also disclosed by other means the exclusivity agreement and the fact that ATTM would not

13  permit customers to unlock their iPhones.  The activation process for the iPhone included the

14  following:  "Can I 'unlock' my iPhone for use with another wireless provider?  No, AT&T is the

15  exclusive wireless provider for the iPhone in the United States."  RJN, Ex. I at 2.  ATTM's 2007

16  and 2008 annual reports also disclosed and promoted the fact that ATTM would be the only U.S.

17  provider of the iPhone when it first launched, and also the iPhone 3G released in mid-2008.  RJN,

18  Exs. J, K (ATTM 2007 and 2008 Annual Reports).  Indeed, ATTM's 2007 annual report included

19  a vignette about a customer who "switched his carrier to AT&T because the company was the only

20  U.S. provider of the iPhone," demonstrating the widespread understanding among consumers that

21  ATTM service was required if one wanted to use an iPhone.  RJN, Ex. J at 11. [2]

22

23  [2] Apple and ATTM's exclusivity arrangement, and its duration, was also widely reported in the
press.  For example, the Wall Street Journal noted in October 2007 that ATTM had obtained

24  "exclusive rights to be the iPhone's U.S. network for an undisclosed period of years" and that
Apple had "locked and relocked the phone to make sure consumers can't override that

25  [exclusivity] restriction."  RJN, Ex. D (Walter S. Mossberg, Free My Phone, Wall St. J., Oct. 22,
2007) (cited at Compl. ¶ 31).  And the notion (and Plaintiffs' allegations) that the exclusivity

26  period was five years came from USA Today, which reported in the months before the iPhone's
launch that ATTM's exclusivity rights would last "for five years—an eternity in the go-go

27  cellphone world[,]" and warned customers:  "If you want an iPhone anytime soon, you'll have to
take your business to AT&T."  RJN, Ex. L (Leslie Cauley, AT&T Eager to Wield Its Weapon,

28  USA Today, May 21, 2007).  Indeed, the fact that the exclusivity period was five years was
widely reported in various other media news outlets in 2007.  *See* RJN, Exs. D-F, H, L-M, O-Z.

1    **D.**    **Relevant Procedural History**

2        This case is the third of three putative class actions filed by the same counsel alleging that

3    Apple and ATTM conspired to monopolize a so-called "aftermarket" for iPhone voice and data

4    services by failing to disclose an alleged secret five-year contract between Apple and ATTM

5    whereby ATTM was to be the exclusive provider of voice and data services for the iPhone.  This

6    claim was first raised in a class action filed back in October 2007, shortly after the first release of

7    the iPhone:

8                    Apple entered into a secret five-year contract with Defendant
                 AT&T Mobility, LLC ('AT&TM') that establishes AT&TM as the
9                 exclusive provider of cell phone voice and data services for iPhone
                 customers through 2012 . . . . Though plaintiffs and class members
10                who purchased iPhones agreed to enter into a two-year voice and/or
                 data service plan with AT&TM, they did not agree to use AT&TM
11                for five years.  Apple's undisclosed five-year exclusivity
                 arrangement with AT&TM, however, effectively locks iPhone users
12                into using AT&TM for five years, contrary to those users' wishes
                 and contractual expectations.

13

14

15    RJN, Ex. C (Case No. 07-cv-5152, Dkt. 102 ¶ 2 ("*iPhone I*")).  *iPhone I*, however, was sent to

16    arbitration after the Supreme Court decided *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740

17    (2011), because the plaintiffs' monopolization theory relied heavily on ATTM's WSA, which

18    contained an arbitration clause.  *See* Case No. 07-cv-05152, Dkt. 553.[3]

19        Plaintiffs' counsel subsequently filed a second case, in which they alleged the same claims

20    as in *iPhone I* but from which they intentionally dropped ATTM as a defendant to avoid

21    arbitration.  *See* Case No. 11-cv-06714 ("*iPhone II*").  The *iPhone II* complaint was initially

22    dismissed under Rule 12(b)(7) because plaintiffs failed to name ATTM as a defendant, which the

23

24    [3] Judge Ware accepted a variant of Plaintiffs' aftermarket theory in *iPhone I*.  *In re Apple & AT&T Antitrust Litig.*, 596 F. Supp. 2d 1288 (N.D. Cal. 2008).  Respectfully, that ruling was

25    erroneous.  In any event, given the differing class period at issue here, there can be no claim that any consumer in the class asserted here was deceived into believing that she could obtain service

26    for the iPhone anywhere except on ATTM.  Moreover, alleged deception is not an antitrust issue. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles*

27    *and Their Application* (4th ed. 2014) ¶ 519 ("Areeda") ("While fraud often leads to circumstances in which one is forced to pay more for a good than its fair market value, such a payment is not a

28    monopoly overcharge and is best remedied by common law or statutory rules designed to reach misrepresentation."); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998) (higher prices as a result of deception are not an antitrust issue).

1    court ruled was an indispensable party.  *See In re Apple iPhone Antitrust Litig.*, 874 F. Supp. 2d

2    889, 901-02 (N.D. Cal. 2012).  The *iPhone II* plaintiffs responded to the dismissal by filing an

3    amended complaint in which they did not join ATTM and alleged that Apple monopolized and

4    attempted to monopolize a separate "aftermarket" for iPhone software applications ("Apps").

5    *iPhone II*, Dkt. 81.  The *iPhone II* complaint was ultimately dismissed by this Court on the ground

6    that the plaintiffs, as indirect purchasers of iPhone Apps, lacked standing under *Illinois Brick*.  *Id.*,

7    Dkt. 124.  The appeal of that dismissal remains pending.  *See* Case No. 14-15000 (9th Cir.).

8         This case, *iPhone III*, was filed more than five years after *iPhone I*, in October 2012, after

9    the Court dismissed the *iPhone II* complaint under Rule 12(b)(7).  A critical difference exists

10   between this case and *iPhone I*, which is that the class period in this case begins on October 19,

11   2008, and thus postdates the filing of *iPhone I* by more than a year.  In addition, the named

12   Plaintiffs here allegedly bought their iPhones *in June and October 2009*, meaning that they bought

13   the iPhone 3G and did so more than two years after the iPhone was first sold and about two years

14   after the *iPhone I* case was filed.  Compl. ¶¶ 9-10.  Notably, the complaint in this case does not

15   explain why Plaintiffs (and consumers generally) were not aware of (or could not have discovered)

16   the alleged "lock-in" to ATTM given:  (1) the public complaint in *iPhone I* alleging just that, (2)

17   all of the publicity in 2007 and 2008 surrounding the fact that ATTM was the sole provider of

18   voice and data services for the iPhone, and (3) the fact that these Plaintiffs were only able to use

19   ATTM services plans with the iPhones they purchased more than *two years* after the iPhone was

20   first sold.

21   **IV.    ARGUMENT**

22        **A.    To Plead a Plausible Section 2 Claim, a Plaintiff Must Allege a Cognizable
23              Relevant Market**

24        Plaintiffs' sole claim is against Apple for allegedly conspiring with ATTM to monopolize

25   the so-called "aftermarket" for iPhone voice and data services in violation of Section 2 of the

26   Sherman Act.  Section 2 "prohibits monopolization, attempted monopolization, and conspiracy to

27   monopolize."  *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 490 (9th Cir.

28   1988).  To state a conspiracy-to-monopolize claim under Section 2, a plaintiff must plausibly

1    allege:  (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in

2    furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) causal antitrust injury.

3    *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  A plaintiff also

4    must plead "both that a 'relevant market' exists and that the defendant has power within that

5    market."  *Newcal*, 513 F.3d at 1044.

6           The antitrust concept of the relevant market is the first line of defense against efforts to

7    advance monopolization claims against companies that are not in fact monopolists—companies

8    like ATTM.  An antitrust complaint must be dismissed under Rule 12(b)(6) if the alleged relevant

9    market is "facially unsustainable" or "it is apparent from the face of the complaint that the alleged

10   market suffers a fatal legal defect."  *Id.* at 1045; *see also Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059,

11   1063 (9th Cir. 2001) ("Failure to identify a relevant market is a proper ground for dismissing a

12   Sherman Act claim.").  Dismissal on the pleadings is particularly appropriate where, as here,

13   plaintiffs either "(1) [engage in a] failed attempt[ ] to limit a product market to a single brand,

14   franchise, institution, or comparable entity that competes with potential substitutes or (2) fail[ ]

15   even to attempt a plausible explanation as to why a market should be limited in a particular way."

16   *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001).

17          In assessing the plausibility of Plaintiffs' Section 2 claim, this Court may draw on

18   "common economic experience" and "history," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565, 567

19   (2007), as well as "experience and common sense," *Ashcroft v. Iqbal*, 556 U.S. 662, 663-664

20   (2009) (citing *Twombly*, 550 U.S. at 556).  Where "there is no reasonable likelihood that the

21   plaintiffs can construct a claim from the events related in the complaint," the "costs of modern

22   federal antitrust litigation . . . counsel against sending the parties into discovery."  *Twombly*, 550

23   U.S. at 558 (citing *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

24   **B.     Plaintiffs' Complaint Is Plainly Deficient Under the Standard Rule That a**
25   **         Relevant Market Must Include All Economic Substitutes for the Defendant's**
26   **         Product**

27          The fundamental rule of antitrust market definition is that a relevant market must

28   "encompass the product at issue *as well as* all economic substitutes for the product."  *Newcal*, 513

1   F.3d at 1045 (emphasis added). "'The outer boundaries of a product market are determined by the

2   reasonable interchangeability of use or the cross-elasticity of demand between the product itself

3   and substitutes for it.'"  *Id.* (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)).  A

4   relevant market must therefore include "the group or groups of sellers or producers who have

5   *actual or potential* ability to deprive each other of significant levels of business." *Id.* (citations and

6   internal quotation marks omitted) (emphasis added); *see also* Phillip E. Areeda & Herbert

7   Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed.

8   2014) ¶ 530 ("Areeda") (a relevant market must include "those producers providing customers of a

9   defendant firm (or firms) with alternative sources for the defendant's product or service"). "The

10  goal in defining a relevant product market is not to obfuscate or confuse market realities, but rather

11  to 'recognize competition where, in fact, competition exists.'"  *United States v. Am. Express Co.*, --

12  - F. Supp. 3d ----, 2015 WL 728563, at *22 (E.D.N.Y. Feb. 19, 2015) (citation omitted).

13          By that common standard, it is clear that ATTM competes in a general market for the sale

14  of cellular voice and data services and against its well-known rivals Verizon, Sprint, and T-Mobile

15  (plus smaller regional carriers).  ATTM is thus not a monopolist; no Section 2 claim is cognizable;

16  and Apple is entitled to dismissal.  In point of fact, this case is that simple.  Everyone knows that

17  ATTM is not a monopolist in cellular voice and data services.  Efforts to use legal doctrine to

18  come to a conclusion that is obviously wrong should be viewed in that light.

19      **C.      A Single-Brand Market for iPhone Services Cannot Be Justified on the**
20              **Ground That the iPhone Is "Unique"**

21          Plaintiffs suggest that a "premium product" is subject to different rules, and that somehow

22  this translates into an ATTM service monopoly over iPhones.  But product differentiation is not a

23  basis for placing a product in its own relevant market.  *See* Areeda ¶ 563a; *United States v. E. I. Du*

24  *Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956) ("[I]llegal monopoly does not exist merely

25  because the product said to be monopolized differs from others.").  As Areeda notes, a properly

26  defined relevant market includes all products—both premium and non-premium—that a consumer

27  could reasonably exchange "for the same purpose[s],"  Areeda ¶ 562b, and so long as those

28  products "perform the same essential function," *id.* ¶ 563a.

1    This issue often arises in the context of relevant-market definitions that are limited to a

2    single brand or a single product—such as voice and data services for the iPhone alone.  Courts are

3    properly skeptical of single-brand market definitions because of their pronounced tendency to

4    exclude important competition.  *See, e.g.*, *Town Sound & Custom Tops, Inc. v. Chrysler Motors*

5    *Corp.*, 959 F.2d 468, 479-80 (3rd Cir. 1992) (en banc) (rejecting market definition limited to

6    Chrysler products because "GM, Ford, Toyota, Honda, and other auto manufacturers are perfectly

7    capable of producing functionally similar and competitive products"); *Domed Stadium Hotel, Inc.*

8    *v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984) (rejecting market definition limited to

9    Holiday Inn hotel rooms and concluding that the relevant market was hotel rooms generally).

10   "[C]ourts generally conclude that single brands do not constitute separate markets."  *Comm. Data*

11   *Servers, Inc. v. Int'l Bus. Machines Corp.*, 262 F. Supp. 2d 50, 66 (S.D.N.Y. 2003) (collecting

12   cases).

13   The courts are also wise to efforts to define the market so that it is exactly coextensive with

14   the only commerce that the defendant can be said to dominate.  *See Redmond v. Missouri Western*

15   *State College*, No. 84-cv-6139, 1988 U.S. Dist. LEXIS 12230, at *4-5 (W.D. Mo. Nov. 2, 1988)

16   ("Antitrust plaintiffs cannot . . . artificially define a market so as to cover only the practice

17   complained of; this would be circular or at least result-oriented reasoning.") (citing *Gen. Bus. Sys.*

18   *v. N. Am. Philips Corp.*, 699 F.2d 965, 975 (9th Cir. 1983)); *Adidas Am., Inc. v. Nat'l/ Coll.*

19   *Athletic Ass'n*, 64 F. Supp. 2d 1097, 1102 (D. Kan. 1999) (same).  That is exactly what Plaintiffs

20   are doing here, defining a market exactly coextensive with ATTM's exclusive rights over the

21   iPhone, and thus ignoring every other aspect of ATTM's competition with other wireless carriers,

22   such as Verizon, Sprint and T-Mobile.  Tautological market definitions of this nature fail as a

23   matter of law.  *See, e.g.*, *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y.

24   1995) ("tautological" market definitions "do not state a claim for Section 2 monopolization");

25   *Burns v. Cover Studios, Inc.*, 818 F. Supp. 888, 892 (W.D. Pa. 1993) (a "relevant market . . .

26   coextensive with the parties to [a] competitor's contract is . . . patently invalid because it is

27   tautological."); *Bridges v. MacLean-Stevens Studios, Inc.*, 35 F. Supp. 2d 20, 29 (D. Me. 1998),

28   *aff'd*, 201 F.3d 6 (1st Cir. 2000) (same).

1    It is therefore of no antitrust significance that "[t]he iPhone is a unique, premium priced

2  product[.]" Compl. ¶ 69. That neither logically nor as a matter of law "generates a unique

3  aftermarket for voice and data services that can be used only on iPhones." *Id.* The fact that

4  ATTM has exclusive rights to a particular *device* does not make its voice and data *services* unique.

5  They are the same basic services that Verizon, Sprint, and T-Mobile offer. As such, antitrust law

6  presumes that the price and quality of ATTM service is constrained by competition from these

7  other carriers. *That is what it means for products to be in the same market. See, e.g., SmithKline*

8  *Corp. v. Eli Lilly & Co.,* 575 F.2d 1056, 1063 (3d Cir. 1978) ("[D]efining a relevant product

9  market is a process of describing those groups of producers which, because of the similarity of

10  their products, have the ability—actual or potential—to take significant amounts of business away

11  from each other."). The fact that for a period of time one phone was not available on the other

12  carriers does not mean that ATTM's overall competitive constraints disappeared.[4]

13    **D.    Plaintiffs Fail to Allege a Cognizable Aftermarket Under *Kodak***

14    Plaintiffs' flagship argument is that the relevant market here is an "aftermarket" for

15  providing voice and data services for iPhones. Compl. ¶¶ 69-71. This is an effort to fit their

16  alleged market within a narrow exception to the standard relevant-market definition paradigm. But

17  just as Plaintiffs fail to plead a relevant market that conforms to any traditional market-definition

18  theory, their purported "aftermarket" definition is even less cognizable, given that (a) they are not

19  actually complaining about an aftermarket, and (b) they have not pled the narrow set of

20  circumstances that make an aftermarket the relevant antitrust market.

21    **1.    The Legal Concept of an Aftermarket: *Kodak***

22    The concept of an aftermarket as a cognizable relevant market emerged from the Supreme

23  Court's decision in *Kodak*. 504 U.S. at 469. There, the Supreme Court held that a derivative

24  aftermarket for the service of Kodak copiers could constitute a relevant market in light of evidence

---

[4] It is notable that Plaintiffs do not plead any facts to suggest that the voice and data services that ATTM offers for the iPhone are distinguishable from those it offers for other smartphones, *e.g.,* iPhone customers get different (less) service for different (higher) prices. At least implicitly, the Complaint acknowledges that some competitive dynamic is regulating the price of service for iPhones.

1    that after excluding competition from independent service organizations Kodak was able to raise

2    its own service prices. *Id.*

3           The presumption (and the ordinary case), however, is that competition in the primary

4    market constrains monopoly power in a derivative aftermarket. *See id.* at 469-70; *SMS Sys.*

5    *Maintenance Servs. v. Digital Equip. Corp.*, 188 F.3d 11, 17 (1st Cir. 1999) ("[I]t ordinarily

6    captures the reality of the marketplace to envision a firm's behavior in the aftermarket as having a

7    direct effect on the 'cross-elasticity of demand' with respect to its products in the primary

8    market.") (citation omitted).  An aftermarket becomes a cognizable relevant market only if

9    competition in the primary market cannot discipline the aftermarket. *Kodak*, 504 U.S. at 473-74.

10    That is precisely what happened in *Kodak*.  There, customers bought Kodak copiers at one point in

11    time expecting that the aftermarket for the service and repair of those copiers would remain

12    competitive, given that Kodak had, for many years, sold spare parts to independent service

13    organizations ("ISOs"). *Id.* at 456-57.  But then Kodak unexpectedly changed its parts policy,

14    cutting off the ISOs who competed with Kodak in servicing copiers.  *Id.* at 458.  This unforeseen

15    policy change abruptly excluded the ISO plaintiffs from the market for servicing Kodak copiers

16    and increased prices in that service aftermarket. *Id.* at 465, 469.  The fact that *after* changing

17    policies Kodak *raised prices* was the key.  As the Supreme Court put it:  "Kodak, then, bears a

18    substantial burden in showing that it is entitled to summary judgment.  It must show that despite

19    evidence of increased prices and excluded competition, an inference of market power is

20    unreasonable." *Id.* at 469.

21           *Kodak* thus involved a policy change that altered the implicit bargain that if the consumer

22    bought a Kodak copier (as opposed to some other brand) they would enjoy the benefits of

23    competition in the aftermarket for future service contracts.  The primary market for copiers and the

24    aftermarket for service were *disconnected* by the policy change.  Consumers faced a service

25    monopoly that they could not have anticipated up front, because Kodak's stated policies *then*

26    accommodated ISO competition, and by the time Kodak changed its policy, consumers had already

27    locked themselves into Kodak copiers.  The market checks on Kodak's behavior that the Supreme

28    Court acknowledged would have existed had the service monopoly been foreseeable were

1    undermined by the post-lock-in change in aftermarket policies.  *See Digital Equip. Corp. v. Uniq*

2    *Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996) ("The Court did not doubt in *Kodak* that if

3    spare parts had been bundled with Kodak's copiers from the outset, or Kodak had informed

4    customers about its policies before they bought its machines, purchasers could have shopped

5    around for competitive life-cycle prices.").

6         That is a very specific and narrow phenomenon, and *Kodak*'s progeny makes clear that

7    cognizable aftermarkets arise only in these circumstances.[5]  There is no cognizable aftermarket

8    where the primary market is competitive and consumers have a reasonable opportunity to discover

9    any allegedly anticompetitive practices in the aftermarket before committing to a particular brand.

10   *See Metzler v. Bear Auto. Serv. Equip. Co., SPX*, 19 F. Supp. 2d 1345, 1353 (S.D. Fla. 1998)

11   ("[A]n antitrust plaintiff cannot succeed on a *Kodak*-type theory where the defendant has not . . .

12   exacted supracompetitive prices by implementing a restrictive anticompetitive change of policy

13   that locked in customers, or used other coercive anticompetitive methods to deceive customers

14   about the prices they would have to pay for parts and service.").  Thus, whether an aftermarket

15   lock-in falls within the *Kodak* exception depends on "the degree of knowledge conveyed by the

16   defendant or its rivals *or otherwise reasonably available* to the buyer when the [primary market

17   product] is purchased[.]"  Areeda ¶ 1740c7 (emphasis added).[6]

18   _____

19   [5] Indeed, few courts have recognized cognizable aftermarkets under the *Kodak* exception.  *See Oracle Am., Inc. v. Terix Computer Co.*, No. 5:13-cv-03385, 2014 U.S. Dist. LEXIS 158060, at

20   *14 (N.D. Cal. Nov. 7, 2014) ("To say that *Kodak* has failed to inspire a strong following would be an understatement."); *see also* Jonathan I. Gleklen, *The ISO Litigation of* Eastman Kodak Co.

21   v. Image Technical Services: *Twenty Years and Not Much to Show for It*, 27 Antitrust 56, 62 (2012) ("Twenty years after the Kodak decision, ISO plaintiffs have little to show for it."); Joshua

22   D. Wright, *Abandoning Antitrust's Chicago Obsession: The Case for Evidence-Based Antitrust*, 78 Antitrust L.J. 301, 310 n.39 (2012) (Kodak "was the zenith of the Post-Chicago School's

23   influence over antitrust law in the United States. However, that influence was short-lived"); David A.J. Goldfine & Kenneth M. Vorrassi, *The Fall of the Kodak Aftermarket Doctrine: Dying a Slow*

24   *Death in the Lower Courts*, 72 Antitrust L.J. 209, 209, 231 (2004) ("The lower courts, in effect, have overruled Kodak by pulling its teeth.").

25   [6] Information available to the buyer "may be contractually explicit *or inferable*[.]"  Areeda ¶ 1740c7 (emphasis added).  Whether a consumer had the requisite information "should be

26   measured by an objective test requiring proof that aftermarket prices were simply not available in the relevant literature"; doing otherwise would "reward customers for not making reasonable

27   inquiries about aftermarket costs."  *Id.* ¶ 564b.  Indeed, consumers need only possess a minimal degree of knowledge about the aftermarket in order to render that aftermarket untenable under the

28   *Kodak* exception.  *Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 956 (D. Ariz. 2001) (holding that "very imperfect knowledge" suffices to take an aftermarket

1    The Ninth Circuit's decision in *Newcal*, which addressed the aftermarket paradigm

2    analyzed in *Kodak*, is entirely consistent with these holdings.  *Newcal* involved similar, albeit more

3    extreme, facts to those in *Kodak*.  IKON, a competitor with Newcal in both the primary market for

4    copier equipment leases and aftermarket for copier equipment upgrades, allegedly engaged in a

5    "scheme to defraud" its own customers by amending its customers' lease agreements and service

6    contracts while "deliberately mislead[ing]" the customers to believe that the amendments would

7    not affect the original contract terms.  513 F.3d at 1043-44.  Newcal alleged that the purpose of

8    IKON's surreptitious amendments was to monopolize the aftermarket for equipment upgrades and

9    lease-end services.  *Id.*  In other words, *after* the initial purchase, IKON took affirmative fraudulent

10   steps to attempt to exploit its locked-in customers.  *Id.* at 1050.

11       To determine whether Newcal alleged a cognizable aftermarket, the Ninth Circuit surveyed

12   *Kodak* and its progeny.  *Id.* at 1047-50.  The court explained that on one end of the spectrum are

13   cases where an aftermarket theory fails at the threshold:  those involving "contractual provisions"

14   that the plaintiffs "knowingly and voluntarily" signed.  *Id.* at 1046-47 (discussing *Queen City*

15   *Pizza v. Domino's Pizza*, 124 F.3d 430, 433-34 (3d Cir. 1997) and *Forsyth v. Humana, Inc.*, 114

16   F.3d 1467 (9th Cir. 1997)).[7]  The Ninth Circuit recognized that the lack of a cognizable

17   aftermarket in these cases was predicated on two findings:  (1) the only "difference among

18   otherwise-substitutable products" was one that was "contractually created," which "was

19   insufficient to create an economically distinct antitrust submarket"; and (2) the plaintiffs made a

20   "made a conscious and voluntary choice" to bind themselves to the aftermarket restrictions in

21

22   lock-in outside of the *Kodak* exception).

[7] In *Queen City Pizza*, a group of Domino's franchisees alleged that Domino's Pizza monopolized
23   the market for pizza ingredients because their franchise agreement with Domino's required them
     to make their pizzas with Domino's-approved ingredients, which Domino's sold at a markup, and
24   to purchase those ingredients from Domino's itself or a Domino's-approved supplier.  124 F.3d at
     433-34.  The Third Circuit held that the franchisees' market definition was legally deficient
25   because the boundaries of the alleged market depended on a contractual obligation that the
     franchisees knowingly and voluntarily signed, and because the primary market for franchise
26   agreements is competitive.  *Id.* at 435, 440.  In *Forsyth*, consumers of Humana health insurance
     policies alleged that Humana, an insurance company, colluded with certain hospitals to give the
27   hospitals a monopoly over the market for Humana insureds.  114 F.3d at 1472.  The plaintiffs
     defined the relevant market based on the insurance policies between the insureds and
28   Humana.  *Id.* at 1476.  The Ninth Circuit rejected that market definition on the ground that
     explicit contractual provisions could not form the boundaries of the relevant market.

1   question by entering into contracts with the defendant, thereby giving the defendant a monopoly

2   over the aftermarket.  513 F.3d at 1046-49.

3        By contrast, the Ninth Circuit emphasized that the consumers in *Kodak* were *never* in a

4   position to reasonably discover the restrictions at issue before they became locked-in because such

5   restrictions were imposed by the defendant *after* the consumers had already been locked-in.  Based

6   on this key distinction between the *Queen City Pizza/Forsyth* cases on the one hand, and *Kodak* on

7   the other, the Ninth Circuit held that the alleged relevant market in *Newcal* was "more like the

8   aftermarket in *Eastman Kodak*" because the consumers in *Newcal* were prevented by the

9   defendant's deceit and fraud from recognizing the aftermarket restrictions at issue *prior* to making

10  a purchase from the defendant in the primary market.  *Id.* at 1049-50.

11       The Ninth Circuit held that whether the *Kodak* exception applies depends on the ability of

12  the consumers to "reasonably discover" the aftermarket restrictions in question prior to becoming

13  locked-in.  *Id.* at 1048.  As the Ninth Circuit explained, the ordinary "economic presumption" is

14  that aftermarket power is constrained by competition in the primary market because "consumers

15  make a knowing choice to restrict their aftermarket options when they decide in the initial

16  (competitive) market" to purchase a product in the primary market that restricts their later choices.

17  *Id.* at 1050.  As a result, the Court noted that one of the key inquiries is whether a complaint

18  adequately alleges that consumers were somehow prevented "from realizing that their choice in the

19  initial market will impact their freedom to shop in the aftermarket."  *Id.*

20       Ultimately, *Newcal*'s analysis confirmed that what courts across the board require to

21  uphold a market definition under the *Kodak* exception is a true aftermarket situation and the

22  absence of an opportunity to "reasonably discover" the aftermarket restrictions prior to the lock-in,

23  *i.e.*, before the first transaction.  Where such an opportunity to reasonably discover exists, a

24  *Kodak*-style claim cannot lie.  *See, e.g.*, *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811,

25  820 (6th Cir. 1997) (noting that "an antitrust plaintiff cannot succeed on a *Kodak*-type theory when

26  the defendant has not changed its policy after locking-in some of its customers, and the defendant

27  has otherwise been forthcoming about its pricing structure and service policies."); *SMS Sys.*

28

1   *Maintenance Servs.*, 188 F.3d at 19 (finding no aftermarket because "the transparency of DEC's

2   allegedly monopolistic policy represents a salient departure from the Kodak scenario").

3           2.     **Plaintiffs' Alleged "Aftermarket" Is Not Cognizable Under *Kodak* and**

                   **Its Progeny**

4

5         Weighed against the dictates of *Kodak* and its progeny, it is clear that Plaintiffs have failed

6   to plead facts supporting the existence of a legally viable aftermarket under *Kodak*.  First,

7   Plaintiffs' so-called "aftermarket" for iPhone voice and data services is not an aftermarket.  The

8   supposed "aftermarket product" was ATTM voice and data service, which was purchased at the

9   same time as the primary-market product, the iPhone.  So the concept of an aftermarket does not

10  apply here and Plaintiffs fail to state a claim for this reason alone.  Furthermore (and independently

11  warranting dismissal), Plaintiffs have not pled (and cannot plead) evidentiary facts that they were

12  unable to reasonably discover, at the time they purchased their iPhones, that ATTM would be the

13  exclusive provider of voice and data service for the iPhone for a multi-year period.

14          a.      **Plaintiffs' Proposed Aftermarket Fails Because It Is Premised on**

                   **Primary and Aftermarket Products Purchased at the Same Time**

15

16        The obvious flaw in Plaintiffs' alleged aftermarket definition is that somehow an

17  "aftermarket" allegedly "came into existence immediately upon the sale of the first iPhones[.]"

18  Compl. ¶ 71.  A cognizable aftermarket under *Kodak* cannot arise when an alleged aftermarket

19  product (iPhone voice and data services) is purchased with the primary product (the iPhone) *at the*

20  *same time*.  *See, e.g.*, *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1201-02 & n.4 (N.D. Cal.

21  2008) (rejecting aftermarket claim because "customers purchase the alleged primary- and

22  aftermarket-products at the same time, as a package"); *see also* Areeda ¶ 1740c4.  This is

23  definitional.  As an influential article by U.C. Berkeley economist Carl Shapiro puts it, in an

24  aftermarket, system "components are purchased at different points in time."  *See* Carl Shapiro,

25  *Aftermarkets and Consumer Welfare: Making Sense of* Kodak, 63 Antitrust L.J. 483, 486 (1995).

26        Where, like here, the primary good and the aftermarket good are allegedly purchased

27  simultaneously, the law presumes that consumers will be protected by the competitive forces in the

28  primary market.  *Queen City Pizza*, 124 F.3d at 440 ("Unlike the plaintiffs in *Kodak*, the Domino's

1    franchisees could assess the potential costs and economic risks at the time they signed the

2    franchise agreement.").  In more practical terms, when consumers are not locked-in at the time

3    they buy the "monopolized" service, they can walk away and purchase some other product.  The

4    Ninth Circuit in *Newcal* addressed this directly; in finding the aftermarket definitions to be

5    cognizable, the court stressed that the allegedly anticompetitive "flex agreements are *not* part of

6    the initial market," and that the alleged monopolist "obtains the flex agreements only *after*

7    obtaining an initial lease or contract."  *Newcal*, 513 F.3d at 1050 (emphasis added).  Courts

8    interpreting *Kodak* uniformly recognize that an affirmative act by the alleged monopolist that was

9    unforeseen, deceitful, coercive, or fraudulent (*e.g.*, a surprise change in policy or terms of service),

10   and that takes place *after* consumers are locked-in, is the cornerstone of *Kodak*'s limited exception.

11   *See, e.g.*, *Queen City Pizza*, 124 F.3d at 440 ("The Kodak case arose out of concerns about

12   unilateral changes in Kodak's parts and repairs policies . . . .  Because this change in policy was

13   not foreseen at the time of sale, buyers had no ability to calculate these higher costs at the time of

14   purchase and incorporate them into their purchase decision."); *see also Lee v. Life Ins. Co. of N.*

15   *Am.*, 23 F.3d 14, 20 (1st Cir 1994); *Digital Equip. Corp.,* 73 F.3d at 763 (7th Cir.).

16            Plaintiffs' allegation that they bought in the aftermarket as soon as they purchased an

17   iPhone dooms any possibility that they have alleged a plausible aftermarket under *Kodak*.

18                         b.        **Plaintiffs Fail to Allege That Consumers Could Not Reasonably
                                     Discover Apple and ATTM's Exclusivity Agreement Prior to**
19                                   **Purchasing an iPhone**

20            Plaintiffs' failure to allege that they could not reasonably discover that ATTM was the

21   exclusive voice and data carrier for the iPhone and that ATTM would not unlock iPhones for use

22   on other carriers also entirely undermines their aftermarket theory.  As explained above, under

23   *Kodak* and *Newcal*, an aftermarket is not the relevant antitrust market unless Plaintiffs lacked an

24   opportunity to "reasonably discover" the restrictions in the alleged aftermarket prior to becoming

25   locked-in, *and* that their ignorance was the result of an unforeseen policy change or some other

26   *post-sale* act of coercion, fraud, or deceit.  The Complaint contains no such allegations.

27            To the contrary, the fact that ATTM was the exclusive cellular carrier for the iPhone was

28   widely publicized and disclosed well before the sale of *any* iPhones remains undisputed.  The

Complaint itself declares that in January 2007—six months before the iPhone launched—"Apple announced that it had entered into an exclusive agreement making ATTM the only authorized provider of wireless voice and data services for iPhones in the United States."  Compl. ¶ 44.  Apple also specifically told consumers—on the label on the original iPhone box, no less—that they would be required to obtain iPhone voice and data service from ATTM for the initial two-year contract period, and that a "[s]ervice plan with AT&T [is] required for cellular network capabilities on expiration of initial two-year agreement."  RJN, Ex. A.  The label further noted that wireless service "is solely provided by" ATTM.  *Id.*  In addition, the WSA (ATTM's contract with its customers for voice and data services) declared that the iPhone was "designed for use exclusively on AT&T's system."  RJN, Ex. B at 12.  And, the iPhone activation process made clear that the iPhone could not be unlocked for use on other carriers' cellular networks.  *See* RJN, Ex. I at 2.

Apple's exclusive arrangement with ATTM was also extensively reported in numerous national news outlets.  The Wall Street Journal noted in October 2007 that ATTM had obtained "exclusive rights to be the iPhone's U.S. network for an undisclosed period of years" and that Apple had "locked and relocked the phone to make sure consumers can't override that [exclusivity] restriction."  RJN, Ex. D (Walter S. Mossberg, Free My Phone, Wall St. J., Oct. 22, 2007) (cited at Compl. ¶ 31).  And Plaintiffs got the notion (and pleaded) that the exclusivity period was five years from *USA Today*, which reported prior to the first sale of the iPhone that ATTM's exclusivity rights would last "for five years—an eternity in the go-go cellphone world[,]" and went on to issue a "[b]ottom line" warning to consumers:  "If you want an iPhone anytime soon, you'll have to take your business to AT&T." RJN, Ex. L (Leslie Cauley, AT&T Eager to Wield Its iWeapon, USA Today, May 21, 2007).  Indeed, it was widely reported in 2007 (before and after the iPhone's launch) that Apple and ATTM's exclusivity agreement was for five years. *See* RJN, Exs. D-F, H, L-M, O-Z.  These news articles, which are judicially noticeable "to indicate what was in the public realm at the time," *Von Saher v. Norton Simon Museum of Art at Pasadena*, 578 F.3d 1016, 1022 (9th Cir. 2009) (internal quotation marks omitted), establish that consumers could reasonably discover the fact that ATTM was the exclusive wireless carrier for the iPhone and that iPhones could only be used on ATTM.  *See also Heliotrope Gen., Inc. v. Ford Motor Co.*,

1    189 F.3d 971, 981 n.118 (9th Cir. 1999) (taking judicial notice "that the market was aware of the

2    information contained in news articles submitted by the defendants").

3         Moreover, Plaintiffs' aftermarket theory was first raised in a class action complaint

4    (*iPhone I*) that Plaintiffs' counsel filed shortly after the first sale of the iPhone in 2007—alleging

5    the very same "aftermarket" for iPhone voice and data service and asserting that consumers were

6    unlawfully "locked-in" to ATTM for a five-year period.  *See* RJN, Ex. C (Case No. 07-cv-5152,

7    Dkt. 102 ¶ 2).  The allegations in *iPhone I* demonstrate, as a matter of law, that all iPhone

8    consumers within the alleged class period could reasonably discover the complained-of restrictions

9    well before any of them first purchased an iPhone in October 2008 (or June and October 2009 in

10   the case of the two named Plaintiffs).  *See Staehr v. The Hartford Fin. Servs.*, 547 F.3d 406, 435

11   (2d. Cir. 2008) (the filing of previous lawsuit containing similar key allegations triggers inquiry

12   notice); *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003)

13   (similar); *In re Zyprexa Prods. Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008) ("Judicial notice

14   can be taken of prior complaints and legal proceedings . . . in determining what the market

15   knew."); *Landow v. Wachovia Secs., LLC*, 966 F. Supp. 2d 106, 119 (E.D.N.Y. 2013) (same).

16        Allegations about whether consumers were told *enough* about ATTM's exclusive rights, in

17   particular how long those rights might last, do not suffice to plead an aftermarket under *Kodak*.

18   An aftermarket can be recognized as a relevant market under *Kodak* only when consumers did not

19   have *any* reasonable opportunity to discover the aftermarket restrictions at issue prior to becoming

20   locked-in; here, Plaintiffs do not (and cannot) allege those requisite facts in light of their own

21   allegations and the judicially noticeable facts highlighted above.

22        The issue here is power:  Was ATTM competitively constrained because consumers had a

23   choice to buy something other than the particular combination of an iPhone with ATTM service, or

24   was it a monopolist?  Consumers obviously had choices, ATTM clearly had competition, and no

25   non-disclosure theory can change that.  Moreover, even imperfect information about the extent to

26   which a consumer may be locked-into an aftermarket upon the initial purchase of a primary

27   product suffices to preclude a cognizable aftermarket theory under *Kodak*.  *See Universal*

28   *Avionics*, 184 F. Supp. 2d at 956.  And as *Newcal* emphasized, so long as consumers can, "at the

1   time of purchase, reasonably discover" that aftermarket restrictions exist, that is as a matter of law

2   the "functional equivalent of a contractual commitment" and defeats a claim of aftermarket

3   monopoly power.  *Newcal*, 513 F.3d at 1048; *see also Blizzard Ent'mt Inc. v. Ceiling Fan Software*

4   *LLC*, 941 F. Supp. 2d 1227, 1236 (C.D. Cal. 2013) (dismissing Sherman Act counterclaims where

5   defendants failed to allege that users of a computer game were "prevented . . . from discovering the

6   restrictions at the outset" on their ability to use third-party software add-ons to enhance the game).

7          It is of no consequence that Apple "failed to obtain iPhone consumers' contractual consent

8   to the five-year Exclusivity Agreement between Apple and ATTM" or "contractual consent to

9   make unavailable to [consumers] the 'unlock code[s]'" for iPhones.  Compl. ¶ 6.  A proposed

10  aftermarket does not become legally cognizable merely because a plaintiff failed to execute a

11  contract agreeing to be locked-into an aftermarket restriction.  Nothing in *Newcal*, or any other of

12  *Kodak*'s progeny, indicates or even suggests that the absence of a contract gives rise, *per se* no

13  less, to a cognizable aftermarket.  *Newcal* recognized that if there is a contract, that by itself

14  precludes a relevant aftermarket.  *See* 513 F.3d at 1048-49.  But it also holds that buying a product

15  with knowledge of the aftermarket condition, or with a reasonable opportunity to find out about it,

16  has the same legal effect.  *Id.* (referring to such a purchase as the "functional equivalent" of a

17  contract accepting the practice).  Most aftermarket cases in which courts rejected *Kodak*

18  aftermarkets do not involve a contract; they involve a policy.  *See SMS Sys. Maintenance Servs.*,

19  188 F.3d at 19 (1st Cir.); *PSI Repair Servs.*, 104 F.3d at 821 (6th Cir.); *Digital Equip. Corp.*, 73

20  F.3d at 762-63 (7th Cir.); *see also Metzler*, 19 F. Supp. 2d at 1354 (recognizing that "an antitrust

21  plaintiff cannot succeed on a Kodak-type theory where the defendant has not . . . exacted

22  supracompetitive prices by implementing a restrictive anticompetitive change of policy that

23  locked-in customers").  Clearly contractual consent—which is not even an antitrust concept—is

24  not essential.

25         Nor does the Complaint allege any unforeseen policy change or some other *post-sale* act of

26  coercion, fraud, or deceit.  Indeed, Plaintiffs' complaint is with the exclusivity agreement

27  announced before the iPhone was first sold and the fact that ATTM was the exclusive carrier and

28  would not permit iPhones to be unlocked.  That was the state of affairs long before any of the

1   Plaintiffs here purchased an iPhone—and there are no allegations of any post-purchase act of fraud

2   or deceit by ATTM.

3          Ultimately, the law will not allow consumers who purchase a product (like the iPhone) with

4   fair notice of what awaits them (no other carrier choices) to claim later that they were victims of an

5   aftermarket monopoly, especially where, as here, those purchases happened at the same time in a

6   highly competitive primary market.  This is all that matters under the *Kodak* paradigm, and

7   Plaintiffs have failed to allege facts satisfying these perquisites here.

8   **V.        CONCLUSION**

9          Because Plaintiffs fail to (and cannot) plead a cognizable relevant aftermarket, their Section

10  2 claim must be dismissed with prejudice.

11  Dated:  September 15, 2015                    Respectfully submitted,

12                                               LATHAM & WATKINS LLP
                                                 Daniel M. Wall
13                                               Christopher S. Yates
                                                 Sadik Huseny
14                                               Aaron T. Chiu
                                                 Ana Gardea
15

16                                               By /s/ Christopher S. Yates
                                                 Christopher S. Yates
17                                               Attorney for Defendant
                                                 Apple Inc.
18

19

20

21

22

23

24

25

26

27

28