LATHAM & WATKINS LLP
  Daniel M. Wall (Bar No. 102580)
  Christopher S. Yates (Bar No. 161273)
  Sadik Huseny (Bar No. 224659)
  Aaron T. Chiu (Bar No. 287788)
  Ana Gardea (Bar No. 280797)
505 Montgomery Street, Suite 2000
San Francisco, CA  94111-6538
Telephone:  +1.415.391.0600
Facsimile:  +1.415.395.8095
Email: Dan.Wall@lw.com
Email: Chris.Yates@lw.com
Email: Sadik.Huseny@lw.com
Email: Aaron.Chiu@lw.com
Email: Ana.Gardea@lw.com

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ZACK WARD and THOMAS BUCHAR, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>APPLE INC.,<br><br>    Defendant. | CASE NO. 4:12-cv-05404-YGR<br>Related to Case No. 4:11-cv-06714-YGR<br><br>**DEFENDANT APPLE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  March 29, 2016<br>Time: 2:00 p.m.<br>Place: Courtroom 1, 4th Floor<br><br>The Honorable Yvonne Gonzalez Rogers |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF ISSUE TO BE DECIDED.................................................... 3

III.   RELEVANT ALLEGATIONS AND PROCEDURAL HISTORY ................................ 4

    A.   Plaintiffs' Conspiracy to Monopolize Count .......................................... 4

    B.   Relevant Procedural History ................................................................ 4

IV.    UNDISPUTED FACTS ....................................................................................... 5

    A.   AT&T, the Alleged Monopolist, Provided Voice and Data Services Long Before the iPhone—and Always Competed with Other Carriers ................................................................................................ 5

    B.   The iPhone and the Original Agreement Between Apple and AT&T ................................................................................................... 6

    C.   The Amended Agreement Between AT&T and Apple ........................... 7

    D.   Disclosures Regarding AT&T Exclusivity and Unlocking ................... 8

    E.   The iPhone 3G and 3GS Were Sold Bundled With AT&T Service ................... 11

    F.   Millions of Consumers Had Personal Experience With AT&T's Policies By the Time Plaintiffs Purchased iPhones ............................. 11

    G.   The *iPhone I* Lawsuit ......................................................................... 12

V.     LEGAL STANDARD......................................................................................... 12

VI.    ARGUMENT ...................................................................................................... 12

    A.   Plaintiffs' Alleged Relevant Market Fails to Include All Economic Substitutes for AT&T's Voice and Data Services and Is Thus Legally Deficient ................................................................................. 14

    B.   There is No Genuine Dispute that Plaintiffs' Alleged Relevant Market is Not an "Aftermarket" Subject to *Kodak* and Its Progeny................... 15

    C.   Even if iPhone Service Qualified as an Aftermarket, the Fact that Consumers Could Reasonably Discover that iPhone Users Would Be Limited to AT&T Precludes it From Being the Relevant Antitrust Market................................................................................. 19

    D.   There is No Evidence That iPhone Consumers Paid Higher-Than-Market Prices For Voice and Data Services, as Required Under the *Kodak* Doctrine. ................................................................................. 25

VII.   CONCLUSION.................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3

*Behrend v. Comcast Corp.*,
    Case No. 03-cv-6604, 2012 U.S. Dist. LEXIS 51889 (E.D. Pa. Apr. 12, 2012) ................... 6

4

5

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...........................................................................................................14

6

*Cyntegra, Inc. v. Idexx Labs.*,
    520 F. Supp. 2d 1199 (C.D. Cal. 2007) ...........................................................................15

7

8

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ...........................................................................................15

9

*Digital Equipment Corp. v. Uniq Digital Technologies*, *Inc.*,
    73 F.3d 756 (7th Cir. 1996) ........................................................................................21, 22

10

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
    504 U.S. 451 (1992)...................................................................................................*passim*

11

12

*Electronics Communications Corp. v. Toshiba America Consumer Products*,
    129 F.3d 240 (2d Cir. 1997)............................................................................................14

13

*Far Out Productions v. Oskar*,
    247 F.3d 986 (9th Cir. 2001) ...........................................................................................14

14

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) .........................................................................................26

15

16

*GTE Inc. v. Continental T.V., Inc*,
    537 F.2d 980 (9th Cir. 1976) ...........................................................................................14

17

*In re September 11 Litigation*,
    621 F. Supp. 2d 131 (S.D.N.Y. 2009)...............................................................................6

18

19

*Landow v. Wachovia Securities*, LLC,
    966 F. Supp. 2d 106 (E.D.N.Y. 2013) .............................................................................25

20

*LC Capital Partners, LP v. Frontier Insurance Group, Inc.*,
    318 F.3d 148 (2d Cir. 2003).............................................................................................25

21

22

*Leonard v. Clark*,
    12 F.3d 885 (9th Cir. 1993) .............................................................................................14

23

*Newcal Industries v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ....................................................................................*passim*

24

25

*Omega Environmental Inc.  v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ...................................................................................14, 17

26

*Oracle America, Inc. v. Terix Computer Co.*,
    No. 5:13-cv-03385, 2014 U.S. Dist. LEXIS 158060 (N.D. Cal. Nov. 7, 2014) ...................19

27

28

*Paddock Publications, Inc. v. Chicago Tribune Co.*,
    103 F.3d 42 (7th Cir. 1996) ................................................................. 17

*Paladin Associates, Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ............................................................. 15

*PSI Repair Services, Inc. v. Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997) ............................................................... 23

*Queen City Pizza v. Domino's Pizza*,
    124 F.3d 430 (3d Cir. 1997)................................................................. 26

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors*,
    637 F.2d 1376 (9th Cir. 1981) ............................................................. 14

*SmithKline Corp. v. Eli Lilly & Co.*,
    575 F.2d 1056 (3d Cir. 1978)............................................................... 16

*SMS System Maintenance Services v. Digital Equipment Corp.*,
    188 F.3d 11 (1st Cir. 1999).......................................................... 18, 23

*Staehr v. The Hartford Financial Services*,
    547 F.3d 406 (2d. Cir. 2008)............................................................... 25

*Universal Avionics Systems Corp. v. Rockwell International Corp.*,
    184 F. Supp. 2d 947 (D. Ariz. 2001) ................................................... 23

## OTHER AUTHORITIES

ABA Section of Antitrust Law, ANTITRUST DEVELOPMENTS 327 (7th ed. 2012) ..................... 21

Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of Kodak*, 63
    Antitrust L.J. 483 (1995)......................................................... 2, 28, 29

David A.J. Goldfine & Kenneth M. Vorrassi, *The Fall of the Kodak Aftermarket
    Doctrine: Dying a Slow Death in the Lower Courts*, 72 Antitrust L.J. 209
    (2004).................................................................................. 26, 28

Herbert Hovenkamp et al., *IP & Antitrust: An Analysis of Antitrust Principles
    Applied to Intellectual Property Law* (2d ed. 2009) ............................... 28

Jonathan I. Gleklen, *The ISO Litigation of* Eastman Kodak Co. v. Image
    Technical Services: *Twenty Years and Not Much to Show for It*, 27 Antitrust
    56 (2012)................................................................................... 26

Jonathan M. Jacobson, *Exclusive Dealing, "Foreclosure," and Consumer Harm*,
    70 Antitrust L.J. 311 (2002)............................................................. 20

Phillip E. Areeda & Herbert Hovenkamp,
    *Antitrust Law* (4th ed. 2013) .................................................... *passim*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

## NOTICE OF MOTION AND MOTION

2        PLEASE TAKE NOTICE THAT on March 29, 2016, at 2:00 p.m., in the United States

3   District Court, Northern District of California, Courtroom 1, 4th Floor, at 1301 Clay Street,

4   Oakland, CA 94612, before the Honorable Yvonne Gonzalez Rogers, Defendant Apple Inc.

5   ("Apple") will and hereby does move the Court for an order for judgment on Plaintiffs'

6   Complaint under Rule 56 of the Federal Rules of Civil Procedure.  This motion is based on this

7   Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the

8   other documents filed in connection with this motion, the papers and records on file in this action,

9   and such other written and oral argument as may be presented to the Court.

10

## RELIEF SOUGHT

11       Defendant Apple seeks an order entering judgment in favor of Apple and against Plaintiffs

12   because Plaintiffs cannot meet their burden of proving a cognizable relevant market.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3    This motion presents the question whether there is a triable issue of fact on Plaintiffs'

4    essential allegation that AT&T Mobility ("AT&T") is a monopolist in a relevant antitrust market.

5    If there is not, Plaintiffs' single count that Apple violated Section 2 of the Sherman Act, 15 U.S.C.

6    § 2, by conspiring with AT&T to make AT&T a monopolist fails as a matter of law.  And free

7    from the constraints of Rule 12(b)(6), the answer is indisputable:  AT&T has strong competitors in

8    the provision of cellular services, and it is by no stretch of the imagination a monopolist.

9    Plaintiffs' artifice of an "aftermarket" for "voice and data services for the iPhone" cannot

10   save their case.

11   ***First***, AT&T does not compete in any aftermarket of the kind described in *Eastman Kodak*

12   *Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992) ("*Kodak*") and its progeny.  The

13   cellular services market long pre-dates the iPhone, and it is neither temporally nor functionally

14   derivative of any particular cellular device, including the iPhone.  Indeed, in virtually all cases,

15   iPhones and AT&T cellular service were acquired at the same time because they *had to be*, as

16   consumers could not activate most iPhone features—including cellular capabilities—without first

17   enrolling in a two-year AT&T service contract.  Plaintiffs Ward and Buchar purchased

18   "subsidized" iPhones, meaning they were able to pay a retail price several hundred dollars below

19   the wholesale price of the phone because they were required to obtain a two-year service contract

20   from AT&T.

21   Furthermore, unlike the aftermarket monopolist envisioned in *Kodak,* AT&T is

22   *continuously* under competitive pressure from Verizon, Sprint, T-Mobile, and others.  The unique

23   issue addressed by the *Kodak* doctrine is whether competition in aftermarket products that the

24   defendant's primary market competitors *do not offer* is nonetheless protected by "systems

25   competition."  *See generally* Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of*

26   Kodak, 63 Antitrust L.J. 483, 486 (1995).  That issue is not presented here.  AT&T and its rivals

27   are always in competition with one another; they offer the same services to anyone who wants to

28   buy them.  Under the most basic of antitrust principles, AT&T and its rivals are in the same

1    relevant market.  *See infra* Section VI.B.

2          **Second**, assuming *arguendo* that "voice and data services for the iPhone" qualifies as an

3    aftermarket, it would not be a relevant antitrust market anyway.  The Supreme Court's concern in

4    *Kodak* was narrowly focused on how a sudden and unexpected *change* in aftermarket practices—

5    something consumers could not anticipate—could permit a firm to exploit an existing base of

6    customers (*i.e.*, customers who had already purchased Kodak copiers).  *Kodak*,  504 U.S. at 473 -

7    74.  Nothing like that occurred here.  AT&T's exclusive rights were publicly announced prior to

8    the iPhone's launch and heavily promoted by AT&T.  There were countless references to those

9    exclusive rights in the media—especially by the time these Plaintiffs purchased their third-

10   generation iPhones in June and October 2009.  And for the first five-and-a-half years of its

11   availability (including nearly two years after AT&T's exclusivity ended), all iPhones sold in the

12   United States were "locked" to particular carriers.  This was widely known and certainly

13   reasonably discoverable; in fact, AT&T announced on its website that "iPhone cannot be unlocked,

14   even if you are out of contract," and Apple and AT&T had numerous other stock statements to that

15   effect.  If there were any doubt, Plaintiffs' single conspiracy-to-monopolize count is based on the

16   same allegations that were knowable enough to have led to the many cases filed in 2007 that were

17   consolidated into *iPhone I*.  As a matter of law, both (a) the absence of a policy change and (b) the

18   indisputable information available about AT&T's exclusive rights defeats the claim that voice and

19   data services for the iPhone is a relevant antitrust market.  *See infra* Section VI.C.

20         **Third**, the concern of the *Kodak* doctrine is that when aftermarkets are economically

21   disassociated from primary markets, locked-in customers might be subjected to discriminatory

22   price *increases* imposed by the alleged aftermarket monopolist.  Yet here, there is no evidence that

23   AT&T ever charged more for iPhone service than it charged for service on other competitive

24   handsets.  In fact, Apple's agreements with AT&T ███████████████████████████

25   ████████████████████████████████████████████████████████████████████

26   ████████████████████████  iPhone customers were therefore guaranteed market rates,

27   which defeats the claim of a separate aftermarket.  *See infra* Section VI.D.

28

1       Throughout the long history of this and the related cases, Plaintiffs' counsel has attempted

2  to convert AT&T into a monopolist through a *legal argument*, namely that a monopoly can arise

3  simply from a failure to obtain consumers' "knowing consent" to certain practices.  Yet the sole

4  case Plaintiffs cite for this theory, *Newcal Industries v. Ikon Office Solution*, 513 F.3d 1038 (9th

5  Cir. 2008), holds no such thing.  *See infra* Section VI.C.2.  In the first place, *Newcal* arose in and

6  only addresses a true aftermarket (the service of copiers at the end of the lease).  It has nothing to

7  do with this case, where consumers buy cellular service at the time they acquire an iPhone, and

8  there is no claim of a later, higher-priced service contract.  That said, *Newcal* identifies two

9  circumstances in which an aftermarket *cannot be* a relevant antitrust market regardless of all other

10 considerations:  (1) where consumers contractually accepted the aftermarket practice, and (2)

11 where consumers could "at the time of [the first] purchase, reasonably discover" the challenged

12 aftermarket practice.  *Id.* at 1048.  AT&T's exclusivity and unlocking policies were easily

13 discoverable by any consumer who made reasonable inquiries, and thus cannot be challenged

14 under a *Newcal*-driven aftermarket theory.

15      *Newcal* does *not* hold, as Plaintiffs will undoubtedly contend, that an aftermarket is

16 conclusively deemed to exist *unless* consumers accepted, contractually or quasi-contractually, the

17 challenged aftermarket practice.  That is false logic, akin to saying that an inability to prove an

18 affirmative defense to a claim establishes a prima facie case of liability.  It is also not any kind of

19 *antitrust* theory.  Section 2 of the Sherman Act is concerned with the actions of monopolists, not

20 firms that fail to make certain disclosures or obtain "consent" to their business practices.  And its

21 concern is that monopolists will exclude competition, not that firms might be insufficiently

22 forthcoming in their sales practices.  Here, the entire monopolization narrative of this case is

23 unfounded.  The reality is that one of four major cellular service providers entered into a three-

24 and-a-half-year exclusive distribution agreement with one of many handset manufacturers.  There

25 are no viable legal grounds for calling that a conspiracy to monopolize.

26 **II.     STATEMENT OF ISSUE TO BE DECIDED**

27      Whether judgment must be entered in Apple's favor and against Plaintiffs with respect to

28 Plaintiffs' single conspiracy-to-monopolize claim under Section 2 of the Sherman Act because

1    Plaintiffs cannot meet their burden of proving a cognizable relevant market.

2    **III.       RELEVANT ALLEGATIONS AND PROCEDURAL HISTORY**

3           **A.       Plaintiffs' Conspiracy to Monopolize Count**

4           Plaintiffs Thomas Buchar and Zack Ward purchased iPhones and AT&T service in June

5    and October of 2009, respectively.  Declarations of Thomas Buchar and Zack Ward, attached as

6    Exhibits A and B to the Declaration of Christopher S. Yates.  Plaintiffs purport to represent a

7    putative class of consumers who purchased iPhones from Apple, AT&T, or elsewhere and also

8    purchased wireless and data services for their iPhones from AT&T between October 19, 2008, and

9    February 3, 2011—the latter date coinciding with the launch of the Verizon iPhone.  Compl. ¶ 1.

10   They assert a single claim against Apple alone under Section 2 of the Sherman Act, alleging that

11   Apple conspired with AT&T to monopolize an "aftermarket" for voice and data services for the

12   iPhone.  *Id.* ¶ 73.  Plaintiffs' theory is that Apple and AT&T entered into a five-year exclusivity

13   agreement, *id.* ¶¶ 19, 44, and that this agreement, which allegedly was not disclosed or

14   contractually agreed upon by the purported class members, "effectively lock[ed] Plaintiffs into

15   using ATTM [AT&T] as their [iPhone] voice and data service provider for the duration of the five-

16   year agreement[,]" *id.* ¶ 21.  According to Plaintiffs, to effectuate this exclusivity agreement,

17   Apple and AT&T agreed to install program locks on the SIM cards in all iPhones and to never

18   release unlock codes.  *Id.* ¶¶ 3, 47.  In other words, Plaintiffs allege that consumers were unable to

19   unlock their iPhones and use them on other cellular networks and were instead required to use their

20   iPhones exclusively on AT&T's wireless network.  This supposed conspiracy allegedly "reduced

21   output and competition and resulted in increased prices" in the so-called voice and data services

22   aftermarket for iPhones and allowed AT&T (but not Apple) to achieve monopoly power in that

23   aftermarket.  *Id.* ¶¶ 74, 75.

24          **B.       Relevant Procedural History**

25          This case is the third of three putative class actions filed by the same counsel alleging that

26   Apple and AT&T conspired to monopolize a so-called "aftermarket" for iPhone voice and data

27   services.  The procedural history of the two actions preceding this one was discussed at length in

28   Apple's Motion to Dismiss of September 15, 2015.  *See* Mot., ECF No. 57 at 7-8.  This case,

1  *iPhone III*, was filed in October 2012, more than five years after the first of these cases, *iPhone I*.

2  Yates Decl., Ex K; *see also* Compl., ECF No. 1.  It therefore covers a different period of time than

3  the original *iPhone I* case.  The beginning of the class period, October 19, 2008, postdates the

4  launch of the original iPhone and the filing of *iPhone I* by more than a year, so consumers had

5  extensive personal experience with AT&T's service plans and policies by then.  In addition, the

6  named Plaintiffs here bought their iPhones *in June and October 2009*, (Buchar Decl. ¶ 2; Ward

7  Decl. ¶ 2), meaning that they bought the third-generation iPhone 3GS and did so more than two

8  years after the conduct at issue had begun and was visible for all to see:  by the beginning of 2009,

9  over ten million iPhones had been sold in the U.S., and by the time of the launch of the iPhone

10  3GS in June 2009, millions more iPhones had been sold.  Declaration of Michael Fenger ¶ 16.

11  Apple moved to dismiss Plaintiffs' Complaint on September 15, 2015, and the Court held

12  oral argument on December 14, 2015.  The Court denied the motion and set a briefing schedule for

13  the instant motion for summary judgment on December 15, 2015.  Order, ECF No. 72.

14  **IV.    UNDISPUTED FACTS**

15  **A.    AT&T, the Alleged Monopolist, Provided Voice and Data Services Long Before the iPhone—and Always Competed with Other Carriers**

16  AT&T Mobility began its operations as Cingular Wireless in October 2000 and provided

17  wireless voice and data services long before Apple introduced the iPhone in 2007.  RJN, Ex. B;

18  AT&T 2006 Annual Report at 31; *see also* Fenger Decl. ¶ 2.  Indeed, as of October 2004, AT&T

19  was "the largest provider of mobile wireless voice and data communications services in the U.S. in

20  terms of subscribers[,]" and, as of December 31, 2006, AT&T "served approximately 61 million

21  customers[.]"  RJN, Ex. B, AT&T 2006 Annual Report at 31.  "As of year-end 2005, there were

22  four mobile telephone operators in the United States that analysts typically describe as

23  'nationwide': Sprint Nextel Corp, Verizon Wireless, LLC, T-Mobile, and Cingular Wireless,

24  LLC."  Yates Decl., Ex. C; 2006 FCC Report at 14 (abbreviations omitted);[1] *see also* Fenger Decl.

25

26

27  [1]  The contents of FCC Reports are admissible under Federal Rule of Evidence 803(8), and courts routinely consider FCC reports in resolving motions for summary judgment.  *See, e.g.*, *In re September 11 Litig.*, 621 F. Supp. 2d 131, 155-56 (S.D.N.Y. 2009); *Behrend v. Comcast Corp.*, Case No. 03-cv-6604, 2012 U.S. Dist. LEXIS 51889, at *31-33 (E.D. Pa. Apr. 12, 2012).

28

¶ 2.  A non-monopolized wireless services market thus existed prior to the first sale of the iPhone in 2007.

Since the first sale of the iPhone, AT&T has continued to compete with Verizon, Sprint, T-Mobile, and other carriers.  Yates Decl., Ex. E, 2010 FCC Report at 7; Ex. F, FCC 2011 Report at 31; *see also* Fenger Decl. ¶¶ 3-5.

Competition among the four major cellular voice and data service providers is fierce; to remain viable, these providers compete aggressively, not only in terms of prices for service plans, but also in terms of coverage, mobile data content, advertising/marketing, and product offerings. Yates Decl., Ex. D, 2009 FCC Report at 65; Fenger Decl. ¶¶ 3-5.  AT&T and other cellular providers advertise the prices and features of their service offerings to the public.  A "key" competitive strategy that cellular voice and data service providers employ is to offer hardware (cellular phones) on an exclusive basis.  Yates Decl., Ex. F, 2011 FCC Report at 90-91; Fenger Decl. ¶ 3.  Verizon, Sprint, and AT&T have all used exclusive device offerings as a competitive tactic.  *Id.*

### B.    The iPhone and the Original Agreement Between Apple and AT&T

Apple launched its first cellular telephone product, the original iPhone (2G), on June 29, 2007.  Fenger Decl. ¶ 8.  The original iPhone was a GSM device, which means it could only function on GSM cellular networks.  *Id.* ¶ 7.  In the U.S., an original iPhone could run on the AT&T GSM network but not on the Verizon or Sprint CDMA networks.  In theory, a GSM iPhone could run on T-Mobile's GSM network, but because of T-Mobile's unusual spectrum, there were technological limitations that impeded the use of the iPhone on T-Mobile's network.  *See* Yates Decl., Ex. D, 2009 FCC Report at 9; Ex. F, 2011 FCC Report at 153 ("T-Mobile's WCDMA handsets operate in the AWS spectrum (1.7/2.1 GHz band) while AT&T's WCDMA handsets operate in the Cellular (850 MHz band) and PCS (1.9 GHz band) spectrum."); *see also* Fenger Decl. ¶ 7.

Apple chose to enter into the cellular handset market with an exclusive arrangement with AT&T to provide cellular voice and data service for the iPhone in the U.S.  Fenger Decl. ¶ 9.  The parties' original agreement made AT&T the exclusive cellular provider for the iPhone in the

1    United States for the term of the agreement.  *Id.*  That term was five years from the date of

2    execution (August 10, 2006), *unless* earlier terminated.  Measured from the launch of the first

3    iPhone, AT&T had at most four years and two months of operational exclusivity.  *Id.*  But even

4    that was subject to earlier termination.

5         The original agreement was, in fact, terminable as early as two years after the first iPhone

6    was sold "for convenience"—meaning for any reason whatsoever.  *Id.*  Since the iPhone was first

7    sold on June 29, 2007, AT&T was guaranteed to be the exclusive cellular provider in the United

8    States only until June 29, 2009.  *Id.*

9         Plaintiffs' theory of the case stresses that Apple and AT&T should have disclosed that

10   AT&T had "five years" of exclusivity.  But that was never true.  In fact, the length of the

11   exclusivity period was indeterminate under the original agreement.  *Id.* ¶ 10.

12        **C.      The Amended Agreement Between AT&T and Apple**

13        In June 2008—a year after the original iPhone was first sold and at the time of the launch

14   of the iPhone 3G—Apple and AT&T amended their agreement in various ways:

15        First, the amendment set a specific termination date for exclusivity:  December 31, 2010,

16   approximately 2 ½ years after the amendment.  *Id.* ¶ 11.  Thus, AT&T ultimately was the exclusive

17   cellular voice and data service provider for the iPhone in the U.S. for about 3 ½ years.

18        Second, the parties eliminated the revenue-sharing component of the original agreement

19   that Plaintiffs have repeatedly complained of.  The original agreement had novel financial terms

20   whereby Apple shared in the revenues AT&T generated through service plans.  *Id.*, Ex. C ¶ 4.  The

21   2008 amendment eliminated revenue sharing for all new iPhone models, including the iPhone 3G

22   first sold in June 2008 and the iPhone 3GS first sold in June 2009.  *See* Fenger Decl. ¶ 11 & Ex. D

23   ¶ 2 ("AT&T will have no obligation to share Qualified Revenue…").  AT&T publicly announced

24   this in June of 2008.  RJN, Ex. A ("The new agreement between Apple and AT&T eliminates the

25   revenue-sharing model …."  The parties adopted the familiar subsidy model instead:

26             For the iPhone 3G and subsequent iPhones, instead of sharing its
27             revenue with Apple, AT&T agreed to subsidize the purchase price
               to be paid for the iPhone, so long as the customer entered into a
28             two-year service contract.  Until recently this was the standard
               model by which cellular phones were sold in the United States.  The

1    carrier takes (and books) a loss on the initial sale of the device,
     since the retail price is less than the wholesale price (hundreds of
2    dollars less in the case of an iPhone).  The carrier recoups the loss
     through its service plans over the two-year period.  Consequently,
3    the carrier insists that the purchase of the phone is accompanied by
     the consumer agreeing to a two-year service contract.
4

5    Fenger Decl. ¶ 8. & Ex. D ¶ 4.

6         Two concepts did not change.  First, both the original and amended agreements ███████

7    ███████████████████████████████████████████████████████████

8    ███████████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   ████████████████████████████████████████  In this way, Apple ensured that

14   AT&T's rates for iPhone customers would be the same market-driven rates that AT&T established

15   for customers purchasing or using a 3G Blackberry, Samsung, or other device.

16        The second concept that did not change was ██████████████████████████

17   ██████████████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████  Fenger Decl.,

24   Ex. D ¶ 5.1.  This was standard in the wireless industry at the time.

25        **D.    Disclosures Regarding AT&T Exclusivity and Unlocking**

26        Apple introduced the iPhone in January 2007 at its MacWorld conference.  Fenger Decl. ¶

27   6 & Ex. A.  Both Apple and AT&T announced that the companies had entered into an agreement

28   making AT&T the exclusive wireless carrier for the iPhone for a "multi-year" period.  *Id.*  Before

1 and after the sale of the original iPhone in June 2007, AT&T extensively advertised the fact that

2 the iPhone was only available on AT&T.  Declaration of Sandy Green ¶¶ 5-8 & Exs. E, F.

3          Both Apple and AT&T made numerous public statements in the 2007 to 2010 timeframe

4 that the iPhone needed to be activated on the AT&T network in order to function as a cellular

5 telephone.  Fenger Decl. ¶ 8.  Apple made available purchase policies for the iPhone on its website

6 and to customers at Apple Retail Stores that said:  "A minimum new two-year wireless service

7 plan with AT&T is required to activate all iPhone features, including iPod features.  Wireless

8 service for iPhone is solely provided by and is the responsibility of AT&T."  Green Decl. ¶ 4 &

9 Ex. C.  The original iPhone box stated that AT&T service was required.  Fenger Decl. ¶ 8 & Ex. B.

10 And, the activation process for the iPhone 3G and 3GS required customers to select an AT&T rate

11 plan in order to activate their iPhone and expressly said that "wireless service plan with AT&T is

12 required to use the wireless phone capabilities of your iPhone." Green Decl. ¶ 3 & Ex. B.

13          AT&T (and Apple) also publicly disclosed that iPhones would not be unlocked.  The FAQs

14 available during the iPhone activation process included the following:

15          ✓   "*Why do I have to activate with AT&T?  Can I use my current
                *wireless provider?*  AT&T is the exclusive provider for the
16               iPhone in the U.S. If you are currently with another wireless
                 provider, you can opt to transfer your current number when you
17               activate your AT&T account."

18          ✓    "*Can I 'unlock' my iPhone for use with another wireless
                 *provider?*  No, AT&T is the exclusive wireless provider for the
19               iPhone in the United State[s]."

20

21 Green Decl. ¶ 2 & Ex. A.  Throughout the 2007 to 2010 timeframe, AT&T's website likewise

22 included answers to questions regarding whether the iPhone could be unlocked:  "**Question:** What

23 is the unlock code for my iPhone?/How do I unlock my iPhone?"  "**Answer:** iPhone cannot be

24 unlocked, even if you are out of contract."  (Declaration of Christopher Butler, Ex. A, attached as

25 Ex. M to the Yates Decl.)  AT&T's sales and customer service representatives were also instructed

26 on how to respond to customer questions about unlocking:

27          ✓   "*Is the device unlockable?*  No, AT&T is the exclusive wireless
                 partner for iPhone in the U.S."

28

✓ "*Can iPhone be unlocked once the customer's two year commitment is complete or via Customer care escalation?*  No, iPhone will not be unlocked under any circumstance."

✓ "The iPhone cannot be unlocked."

✓ "AT&T is not supporting unlock code requests for this device for any reason, as AT&T is the exclusive provider of the iPhone in the United States."

(Mahone-Gonzalez Decl. ¶¶ 2-11, attached as Ex. L to the Yates Decl.)

Apple and AT&T's exclusivity arrangement and the fact that the iPhone would not be unlocked was also widely reported in the press.  For example, the *Wall Street Journal* noted in October 2007 that AT&T had obtained "exclusive rights to be the iPhone's U.S. network for an undisclosed period of years" and that Apple had "locked and relocked the phone to make sure consumers can't override that [exclusivity] restriction." Yates Decl., Ex. H, Walter S. Mossberg, Free My Phone, *Wall St. J.*, Oct. 22, 2007).  And *USA Today* reported in the months before the iPhone's launch that AT&T's exclusivity rights would last "for five years—an eternity in the go-go cellphone world[,]" and warned customers:  "If you want an iPhone anytime soon, you'll have to take your business to AT&T." *Id.*, Ex. I, Leslie Cauley, AT&T Eager to Wield Its Weapon, *USA Today*, May 21, 2007.  An article provocatively titled "*Want Your iPhone Unlocked? Too Bad*," quoted Apple in a Q&A: "Q: Is it possible to unlock an iPhone? A: 'Neither company will provide an unlock code for the iPhone,' wrote Apple spokeswoman Jennifer Bowcock in an e-mail response to a question from the Seattle P-I." *Id.*, Ex. J.

After Apple and AT&T amended their contract and began selling the iPhone 3G in June 2008 (and then in 2009, the iPhone 3GS), the companies continued to publicize the fact that AT&T was the exclusive voice and data services provider and that purchasing the iPhone meant the customer needed AT&T service.  The iTunes activation process continued to require a customer to select an AT&T rate plan and told customers that a "wireless service plan with AT&T is required to use the wireless phone capabilities of your iPhone."  Green Decl. ¶ 3 & Ex. B; *see also* Green Decl. ¶ 4 & Ex. C (Apple retail store checkout process for iPhone requiring iPhone customers to select an AT&T plan and to read and accept AT&T's Wireless Service Agreement and other

1  AT&T terms of service prior to activation). This message was displayed to consumers before they

2  completed the activation of their iPhones, and the same message was conveyed to iPhone

3  customers through various other means such as press releases, and Apple's website.  *See* Fenger

4  Decl. ¶¶ 6, 15 & Ex. A, E, F; Green Decl. ¶¶ 5-8 & Ex. D-F.

### E.   The iPhone 3G and 3GS Were Sold Bundled With AT&T Service

6  Plaintiffs and all others like them who bought iPhone 3G or 3GS devices bought subsidized

7  phones.  Fenger Decl. ¶ 11 & Ex. D ¶ 4.  The purchase price they paid was several hundred dollars

8  below the wholesale price, and was therefore conditioned on a two-year service commitment.  *Id.*

9  This subsidization and bundling arrangement, which of course was hardly unique to the iPhone,

10  was heavily publicized.  *See, e.g.*, Yates Decl., Ex. F; 2011 FCC Report at 60 ("Purchase of a

11  monthly data plan is typically a requirement for smartphones such as the iPhone and its closest

12  competitors."); *see also* Green Decl. ¶ 4 & Ex. C (retail store process included "discount" to

13  qualified iPhone purchasers).

14  When Plaintiff Buchar bought his iPhone 3GS at an AT&T store in June 2009, and when

15  Plaintiff Ward bought his at an Apple retail store in October 2009, each would have been required

16  to select an AT&T service plan and enter into an AT&T service contract; only then would the

17  cellular telephone capabilities of the iPhone be activated.  *Id.*; Fenger Decl. ¶ 12.[2]

### F.   Millions of Consumers Had Personal Experience With AT&T's Policies By the Time Plaintiffs Purchased iPhones

20  By the beginning of 2009, over 10 million iPhones had been sold in the U.S.  By the time

21  Mr. Buchar purchased his iPhone in June, millions more iPhones had been sold.  Fenger Decl. ¶

22  16.  All of these iPhones were locked to the AT&T network and AT&T did not release unlock

23  codes for any of them.  *Id.*  There is no evidence that at any time prior to Plaintiffs' purchases, any

---

25  [2]  In the unlikely event that Mr. Buchar or Mr. Ward had not understood at the time of purchase
    that a two-year AT&T contract was required and that the iPhone would not be unlocked, they
26  could have returned their iPhones and terminated their AT&T service contract.  AT&T's
    Wireless Services Agreement provided: "You may terminate this Agreement within thirty (30)
27  days after activating service without paying an Early Termination Fee. You will pay for service
    fees and charges incurred through the termination date, but AT&T will refund your activation
28  fee, if any, if you terminate within three (3) days of activating the service.  Also, you may have
    to return any handsets and accessories purchased with this Agreement." RJN, Ex. C § 4.

AT&T customer had paid an early termination fee and, with unlocking codes provided by AT&T, used the iPhone on T-Mobile's network. *Id.* Apple certainly did not disseminate any information to iPhone customers that suggested that they would be able to use their iPhone with a carrier other than AT&T after paying an early termination fee. *Id.*

### G.    The *iPhone I* Lawsuit

Shortly after the release of the initial iPhone, counsel for Plaintiffs brought suit against Apple and AT&T alleging a conspiracy to monopolize a claimed "aftermarket" for iPhone voice and data services by failing to disclose a "secret" five-year contract between Apple and AT&T. Yates Decl., Ex. K, *iPhone I*, Compl. ECF No. 1. The allegations in *iPhone I* revealed all the so-called secrets that the theory of this case is based on. *Id.*

## V.   LEGAL STANDARD

"Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment. Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Prods. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## VI.   ARGUMENT

The principal conduct at issue is the Apple-AT&T exclusive distribution agreement, providing that AT&T would be the exclusive cellular provider for customers buying the iPhone in the United States. Exclusive distribution would ordinarily be evaluated under the rule of reason under Section 1 of the Sherman Act, and it is "presumptively legal." *Electronics Communs. Corp. v. Toshiba Am. Consumer Prods.,* 129 F.3d 240, 245 (2d Cir. 1997) (discussing the legality of "exclusive distributorship arrangements"); *see also Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs.,* 637 F.2d 1376, 1386-88 (9th Cir. 1981); *GTE Inc. v. Continental T.V., Inc,* 537 F.2d 980, 997 (9th Cir. 1976) (en banc) ("There is a veritable avalanche of precedent to the effect that, absent evidence of monopolization, a manufacturer may legally grant . . . an exclusive

1    franchise[.]"), *aff'd,* 433 U.S. 36 (1977).

2         One might also think of the Apple-AT&T agreement as an exclusive dealing contract,

3    with AT&T acquiring 100% of the rights to carry the iPhone in the United States.  Exclusive

4    dealing is also ordinarily assessed under the rule of reason, and condemned only when a firm with

5    strong market power in a relevant market is able to exclude rivals from the market.  *See, e.g.*,

6    *Omega Envtl. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162-65 (9th Cir. 1997); Jonathan M. Jacobson,

7    *Exclusive Dealing, "Foreclosure," and Consumer Harm*, 70 Antitrust L.J. 311, 312 (2002)

8    ("Exclusive arrangements are only rarely the source of serious antitrust concern.").[3]

9         Plaintiffs do not want this case analyzed as either exclusive distribution or dealing because

10   they would be unable to plead or prove the required market foreclosure or the absence of business

11   justifications.  So, instead, their sole claim against Apple is for "conspiracy to monopolize" under

12   Section 2.  By labeling the conduct as such, Plaintiffs try to have their claim assessed solely under

13   the generalized elements of a conspiracy-to-monopolize claim.  They are: (1) the existence of a

14   combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a

15   specific intent to monopolize; and (4) causal antitrust injury.  *Paladin Assocs., Inc. v. Montana*

16   *Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

17        Plaintiffs, however, acknowledge the need to plead and prove a relevant market.  In order

18   to distinguish conspiracy-to-monopolize claims from Section 1 claims, courts require proof that

19   the alleged Section 2 conspiracy, if successful, would result in monopoly.  *See Dickson v.*

20   *Microsoft Corp.,* 309 F.3d 193, 211 (4th Cir. 2002) ("[W]ithout allegations regarding the market

21   power or share of Compaq or Dell in the PC market, Gravity is unable to show a conspiracy to

22   monopolize under §2[.]"); ABA Section of Antitrust Law, ANTITRUST DEVELOPMENTS 327 (7th

23   ed. 2012) ("[W]here the alleged conspiracy, if successful, would not amount to illegal

24   monopolization, there may be no liability for conspiracy to monopolize").  To meet this

25

26   ───────────────
     [3]  Whether one views the conduct at issue as exclusive distribution or exclusive dealing is simply
27   a matter of perspective.  From Apple's perspective, it constrained its own distribution by
     appointing AT&T as its sole service partner.  From AT&T's perspective, it acquired exclusive
28   rights to the iPhone.  Either way, antitrust law will not condemn the conduct absent a showing
     of strong market power, proven anticompetitive effects, and the absence of business
     justifications.

1   requirement, a plaintiff must show "both that a 'relevant market' exists and that the defendant has

2   power within that market." *Newcal*, 513 F.3d at 1044.  A Section 2 claim predicated on a relevant

3   market definition that is unsupported by the evidence cannot survive summary judgment.  *See,*

4   *e.g.*, *Cyntegra, Inc. v. Idexx Labs.*, 520 F. Supp. 2d 1199, 1209 (C.D. Cal. 2007) (granting

5   defendant's motion for summary judgment in part because the plaintiff "fail[ed] to produce

6   admissible evidence supporting its definition of the relevant product market").

7
     **A.     Plaintiffs' Alleged Relevant Market Fails to Include All Economic Substitutes**
8              **for AT&T's Voice and Data Services and Is Thus Legally Deficient**

9          The foundational principle of market definition is that an alleged relevant market must

10  include "the product at issue as well as all economic substitutes for the product."  *Newcal,* 513

11  F.3d at 1045.  A plaintiff is thus required to include in an alleged relevant market definition all

12  sellers "who have actual or potential ability to deprive" the alleged monopolist of "significant

13  levels of business." *Id.*

14         The market in which AT&T voice and data services are sold includes Verizon, T-Mobile,

15  Sprint, and other carriers.  This is the "mobile wireless telecommunications services" market that

16  the Department of Justice alleged when it sued to block AT&T's proposed merger with T-Mobile,

17  and the "mobile wireless services" market studied and reported on by the Federal

18  Communications Commission in its annual Mobile Wireless Competition Reports.[4]  The market

19  includes Verizon, T-Mobile, and Sprint, as well as AT&T, for the simple reason that AT&T's

20  voice and data services are in direct and heated competition with the service offerings of those

21  other carriers.  *See, e.g.*, *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056, 1063 (3d Cir. 1978)

22  ("[D]efining a relevant product market is a process of describing those groups of producers

23  which, because of the similarity of their products, have the ability—actual or potential—to take

24  significant amounts of business away from each other.").  According to the FCC, in the years

25  relevant to this case, AT&T's market share in "mobile wireless service" fluctuated between

26  28.9% and 32.4% percent, far below monopoly thresholds.[5]

27  _____
    [4] *See U.S. and Plaintiff States v. AT&T Inc.,* available at http://www.justice.gov/atr/case-
28  document/complaint-35; *see generally* Yates Decl., Ex. C-G_(FCC Wireless Reports).

    [5] Yates Decl., Ex. G, 2013 FCC Report at 53-54.

1    The fact that a wireless carrier may have exclusive rights to a particular handset does not

2    end competition with other carriers.  Competition frequently occurs among firms with exclusive

3    rights to competitively valuable assets, and *for* exclusive rights as well.  *See, e.g.*, *Omega*, 127

4    F.3d at 1164–65 (upholding exclusive dealing by firm with 55% market share where the market

5    nonetheless remained competitive); *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42,

6    45 (7th Cir. 1996) (Easterbrook, J.) ("Competition-for-the-contract is a form of competition that

7    antitrust laws protect rather than proscribe, and it is common.").  Here, Verizon, T-Mobile, and

8    Sprint did not cede to AT&T every customer who wanted an iPhone.  While iPhone exclusivity

9    was in place, AT&T's competitors ran ads and promotions that tried to convince existing and

10   potential customers that they would be better served with a different phone on a better network.

11   Fenger Decl. ¶¶ 3-5.  AT&T surely had a competitive *advantage* because it alone had the iPhone,

12   but "the antitrust laws were not designed to equip [AT&T's competitors] with [AT&T's]

13   legitimate competitive advantage."  *Omega*, 127 F.3d at 1163.

14   Plaintiffs make much of the fact that the iPhone is a "unique, premium priced product[.]"

15   Compl. ¶ 69.  That neither logically nor legally "generates a unique aftermarket for voice and data

16   services that can be used only on iPhones."  *Id.*  Again, the fact that AT&T has exclusive rights to

17   a particular *device* may differentiate its offering, but it does not make its voice and data *services*

18   "unique."  They are the same basic services that Verizon, Sprint, and T-Mobile offer—and they

19   are *exactly* the same services that AT&T offers to its other customers.  ███████████████

20   ████████████████████████████████████████████████████████████

21   █████████████████████   Fenger Decl. ¶ 13.  So every competitive force that affected

22   AT&T's service plans generally inured to the benefit of iPhone users, too.  That is what it means

23   for products to be in the same market.

### B.    There is No Genuine Dispute that Plaintiffs' Alleged Relevant Market is Not an "Aftermarket" Subject to *Kodak* and Its Progeny

26   Plaintiffs will contend that their Section 2 claim should survive summary judgment even

27   though their alleged relevant market excludes all competitors of AT&T on the ground that there is

1   an iPhone-only service market that fits within the *Kodak* "aftermarket" doctrine.  That argument

2   fails at the threshold because AT&T does not participate in any genuine aftermarket.

3           1.      ***Kodak* and the Antitrust Significance of Aftermarkets**

4           The concept of an aftermarket as a cognizable relevant market emerged in *Kodak*.  504

5   U.S. at 469.  There, the Supreme Court held that a derivative aftermarket for the service of Kodak

6   copiers could constitute a relevant market in light of evidence that after excluding competition

7   from independent service organizations Kodak was able to raise service prices to "locked-in"

8   Kodak service customers.  *Id.* at 469-476.

9           The *Kodak* doctrine is about a discrete circumstance.  Kodak competed with Xerox and

10  others in the manufacture and sale of copiers, and clearly did not have market power (let alone

11  monopoly power) in that market.  In antitrust terms, the copier market was structurally

12  competitive.  But the structure of the market for post-sale service and support of was different.

13  Neither Xerox nor any of Kodak's many copier competitors offered service on Kodak copiers.

14  Kodak competed for post-warranty service contracts only with independent service organizations

15  ("ISOs"), and its market share of service was a very monopoly-like "80% to 95%."  *Id.* at 457.

16          In that context, Kodak argued that it could not profitably exercise monopoly power in the

17  service market because if it did so its competitive position in the copier market would suffer.  In

18  other words, Kodak said that competition in the *primary* market (for copiers) would constrain its

19  behavior in the *aftermarket* (for service).  The Supreme Court agreed that an aftermarket becomes

20  a cognizable relevant market only if primary market competition ceases to constrain an

21  aftermarket.  *Kodak*, 504 U.S. at 469 n.15, 473-74.[6]  Yet it held that "whether competition in the

22  equipment market will significantly restrain power in the service and parts markets" presented a

23  factual issue that, in that case, could not be resolved on summary judgment.  *Id.* at 469 n.15.

24          The Court emphasized that Kodak had abruptly and unexpectedly *changed* its aftermarket

25  practices from initially supporting and selling spare parts to ISOs to cutting off every avenue by

---

26  [6]  *See also Newcal*, 513 F.3d at 1050 (the "economic presumption" is that aftermarket power is

27  constrained by primary market competition; *SMS Sys. Maintenance Servs. v. Digital Equip. Corp.*, 188 F.3d 11, 17 (1st Cir. 1999) ("[I]t ordinarily captures the reality of the marketplace to

28  envision a firm's behavior in the aftermarket as having a direct effect on the 'cross-elasticity of demand' with respect to its products in the primary market.") (citation omitted).

1    which the ISOs could obtain parts.  *Id.* at 458.  This unforeseen policy change excluded ISOs from

2    the service market, allowing Kodak to increase service prices.  *Id.* at 465, 469.  The key fact was

3    that *after* that policy change Kodak *raised prices*:  "Kodak, then, bears a substantial burden in

4    showing that it is entitled to summary judgment.  It must show that despite evidence of increased

5    prices and excluded competition, an inference of market power is unreasonable."  *Id.* at 469.  The

6    Court ultimately held that Kodak failed to meet that burden, so summary judgment was improper.

7         *Kodak* was decided 23 years ago, and as we discuss below there is today a considerable

8    judicial gloss on its teachings.  As Judge Grewal recently wrote:  "To say that *Kodak* has failed to

9    inspire a strong following would be an understatement."  *Oracle Am., Inc. v. Terix Computer Co.*,

10   No. 5:13-cv-03385, 2014 U.S. Dist. LEXIS 158060, at *14 (N.D. Cal. Nov. 7, 2014) (collecting

11   authorities).  Nevertheless, for present purposes, the first and only point the Court needs to reach

12   is that *Kodak* cases arise in true aftermarkets and this case does not.

13                    2.    **AT&T Does Not Sell Services In Any Aftermarket**

14        *Kodak* addresses the unique phenomenon of the aftermarket:  a market that (1) is

15   derivative of and would not exist but for the sale of the primary product; (2) is structurally

16   different than the primary market, with a different set of rivals; and (3) is temporally disconnected

17   from the primary market in that consumers are buying components of a system *over time*, such as

18   a car initially (in the "primary" market) and parts and service afterwards (in the "aftermarket").

19   For example, *Kodak* and *Newcal* concern post-warranty and lease-end service of copiers that had

20   been acquired previously, in separate transactions.  *See Kodak*, 504 U.S. at 454-58; *Newcal*, 513

21   F.3d at 1043-44.  In both cases there were unique elements to servicing Kodak or Ikon copiers

22   (such as proprietary parts), there were different sets of competitors servicing and selling copiers,

23   and the copiers and the relevant copier service were sold at different times.  As the Ninth Circuit

24   emphasized in *Newcal*, "the relevant market here is not the indisputably competitive market in

25   which the consumers *first* shop for the primary product.  It is an "*aftermarket* in which the

26   consumers claim that they should be able to shop *for a secondary product*," purchased after the

27   initial copier lease and service contract expired.  *Newcal*, 513 F.3d at 1049 (emphasis added).

28        AT&T's voice and data services do not fit within this paradigm.  First and most obviously,

1  the mobile wireless services market existed well before the iPhone was sold.  That market is by

2  no means "derivative" of any individual handset, including the iPhone.  *See* P. Areeda & H.

3  Hovenkamp, *Antitrust Law* ¶ 531 (4th ed. 2013) ¶ 564b ("An aftermarket is a type of derivative

4  market consisting of consumable goods or replacement components that must be used for the

5  proper functioning of some primary good.").  AT&T sells the same voice and data services to its

6  customers who use hardware (cellular phones) other than the iPhone, and like every handset

7  maker Apple was the one who had to engineer the phone to work on that network.

8      Second, AT&T is continuously in competition with other wireless services companies.

9  There is no aftermarket "haven" in which Verizon, T-Mobile, and Sprint are absent, as Xerox and

10  other copier makers were absent from the Kodak service market.  There is indisputable evidence

11  that Verizon, T-Mobile, and Sprint competed for actual and potential iPhone customers during the

12  period of AT&T's exclusivity.  Fenger Decl. ¶¶ 2-5.  That competition is particularly clear in this

13  case because Plaintiffs are attempting to make the *first* iPhone service contract part of the alleged

14  aftermarket.  The option of buying another smartphone and another carrier's service was plainly

15  available to Buchar and Ward when, in 2009, they chose an iPhone and AT&T instead.

16      Third, the *Kodak* aftermarket doctrine never applies when consumers purchase the

17  primary market product at the same time as the claimed aftermarket product.  *See Digital Equip.*

18  *Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996) ("The Court did not doubt in

19  *Kodak* that if spare parts had been bundled with Kodak's copiers from the outset, or Kodak had

20  informed customers about its policies before they bought its machines, purchasers could have

21  shopped around for competitive life-cycle prices."); Shapiro, 63 Antitrust L.J. at 486 (explaining

22  that one of the three "key elements to an aftermarket" is that the primary components and the

23  derivative components that make up the aftermarket be "purchased at different points in time");

24  Areeda ¶ 564b ("[A] precondition to market power as a result of 'lock-in' is customers who are

25  actually locked in . . . . [W]hen a primary good and the 'aftermarket' good are sold at the same

26  time, such as a computer together with its bundled software, there is no lock-in.").

27      Here, Plaintiff Buchar admits that he purchased his iPhone and AT&T service together, at

28  an AT&T store.  Yates Decl., Ex. A, Buchar Decl. ¶ 3.  Plaintiff Ward claims he does not

1    remember whether or not he did, but there is no doubt that he did, because he had no choice.

2    Apple did not sell an unlocked iPhone until 2012, and in 2009 (when both Buchar and Ward

3    purchased iPhones) Apple and AT&T were operating under the subsidy model whereby the

4    nominal retail price was hundreds of dollars below the wholesale price, but was conditioned on a

5    two-year AT&T service contract.  Fenger Decl. ¶¶ 11, 12, 16; Yates Decl., Ex. D, 2009 FCC

6    Report at 81.  Furthermore, the cellular capabilities of the iPhone did not function until the

7    consumer selected an AT&T rate plan and executed an AT&T service contract during the

8    activation process.  Fenger Decl. ¶ 12; Green Decl. ¶¶ 3-5 & Ex. B-D.

9         AT&T does not compete in any aftermarket.  It competes in the wireless services market

10   against Verizon, T-Mobile, Sprint and others.  And Plaintiffs do not allege and could not establish

11   that AT&T is or was a wireless services monopolist.

12   **C.    Even if iPhone Service Qualified as an Aftermarket, the Fact that Consumers
13          Could Reasonably Discover that iPhone Users Would Be Limited to AT&T
            Precludes it From Being the Relevant Antitrust Market**

14          **1.    *Kodak* Aftermarkets Are Limited to Cases Challenging Practices That
15                  Consumers Cannot Anticipate Before Becoming "Locked-In"**

16        The *Kodak* decision was grounded in the concern that an equipment seller controlling a

17   proprietary aftermarket might take advantage of locked-in consumers by charging them more for

18   aftermarket goods and service than they *expected to pay* when they chose the primary product.

19   *See Shapiro*, 61 Antitrust L.J. at 486-87, 504 (referring to the economics of "installed base

20   opportunism").  The aftermarket theory is therefore expressly dependent on what the Supreme

21   Court called "information costs" that make it "difficult and costly" to anticipate the full costs of

22   ownership.  *Kodak,* 504 U.S. at 474; *see also id.* (in the case of copiers, "[m]uch of [the relevant]

23   information is difficult—some of it impossible—to acquire at the time of purchase").  *Kodak*

24   itself turned on the fact that by changing aftermarket policies and raising prices, Kodak had done

25   something unforeseeable, thereby altering the implicit bargain that if consumers bought a Kodak

26   copier (as opposed to some other brand) they would enjoy the benefits of competition in the

27   aftermarket for future service contracts.  That said, all nine Justices agreed that had there been

28   evidence that Kodak's restrictive practices were generally known, the primary copier market

1   would have been the relevant market.  *See Kodak*, 504 U.S. at 477 n.24 (majority opinion), 492

2   (Scalia, J., dissenting); *see also Newcal,* 513 F.3d at 1048-49.

3           The post-*Kodak* case law makes clear that cognizable aftermarkets arise only in these

4   circumstances.  Specifically, there is no cognizable aftermarket where consumers have a

5   reasonable opportunity to discover any restrictive aftermarket practices before committing to a

6   particular brand.  *See, e.g.*, *Newcal*, 513 F.3d at 1048 (whether the *Kodak* exception applies

7   depends on the ability of the consumers to "reasonably discover" the aftermarket restrictions in

8   question prior to becoming locked-in); *SMS Sys*, 188 F.3d at 19 (finding no aftermarket because

9   "the transparency of DEC's allegedly monopolistic policy represents a salient departure from the

10  *Kodak* scenario"); Areeda ¶ 1740c7 (addressing "the degree of knowledge conveyed by the

11  defendant or its rivals *or otherwise reasonably available* to the buyer when the [primary market

12  product] is purchased") (emphasis added).  Such information "may be contractually explicit or

13  inferable," and the sufficiency of the information "should be measured by an objective test

14  requiring proof that aftermarket prices were simply not available in the relevant literature.  Areeda

15  ¶ 564b.[7]  The law measures "reasonable discoverability" by *the totality* of the information

16  available to consumers in the market, and it also imposes a duty on consumers to make

17  "reasonable inquiries about aftermarket costs."  *Id.*

18          Most courts go even further and require an unforeseeable policy change as in *Kodak*.  *See,*

19  *e.g.*, *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) (noting that "an

20  antitrust plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its

21  policy after locking-in some of its customers, and the defendant has been otherwise forthcoming

22  about its pricing structure and service policies."); *Metzler v. Bear Auto. Serv. Equip. Co., SPX*, 19

23  F. Supp. 2d 1345, 1353 (S.D. Fla. 1998) (a "plaintiff cannot succeed on a *Kodak*-type theory

24  where the defendant has not . . . exacted supracompetitive prices by implementing a restrictive

25

26  _____

    [7] Approaching the issue subjectively, Professor Areeda notes, would "reward customers for not
    making reasonable inquiries about aftermarket costs."  Areeda ¶ 564b.  Moreover, consumers
27  need only have access to basic information about the aftermarket in order to render the
    aftermarket untenable under the *Kodak*.  *See Universal Avionics Sys. Corp. v. Rockwell Int'l*
28  *Corp.*, 184 F. Supp. 2d 947, 956 (D. Ariz. 2001) (quoting Areeda ¶ 1740) (holding that "very
    imperfect knowledge" suffices to take an aftermarket lock-in outside of the *Kodak* exception).

1    anticompetitive change of policy that locked in customers, or used other coercive anticompetitive

2    methods to deceive customers about the prices they would have to pay for parts and service.").

3          Either way, it is beyond all reasonable dispute that Plaintiffs Ward and Buchar, like

4    iPhone purchasers generally, had abundant information available to them that AT&T had

5    exclusive rights to the iPhone; that iPhone users were therefore required to enter into an AT&T

6    service contract, the terms of which were as clear as any service plan; and that there was no

7    sanctioned way by which they could unlock their iPhones to use them on another carrier.

8          *AT&T's Exclusivity:*  Information about exclusivity was accessible to consumers in all

9    conceivable forms beginning early in 2007 and throughout the alleged class period.  AT&T

10   publicly announced and heavily marketed exclusivity prior to the launch of the iPhone, for the

11   most obvious reason: it wanted consumers to know that the iPhone was only available on its

12   network.  Among the countless references to AT&T's exclusive rights were statements in the

13   disclosures (contractual and otherwise) that Apple and AT&T provided at the point of sale, on

14   signage at Apple stores, on Apple and AT&T's websites, in iTunes, in press releases and news

15   articles, in Annual Reports, and in the FCC's annual Wireless Competition Reports.  *See* Sections

16   IV. D. & E., *supra*.

17         *The Requirement of a Two-Year AT&T Service Contract:*  It is inconceivable that

18   consumers would not have known that they needed to agree to a two-year AT&T service contract,

19   because in the relevant period of time that was the only way to activate the cellular capabilities of

20   the device.  Of course, because it was a requirement, it was widely disclosed as well.

21         Plaintiffs do not deny this, but instead argue that consumers in the class period expected to

22   be able to pay an early termination fee of $175 and immediately use their iPhones on T-Mobile.

23   This is an entirely fabricated option.  AT&T sold iPhone 3G and iPhone 3GS devices for

24   hundreds of dollars less than it paid Apple for the devices, a business model that depends on

25   recouping the upfront loss over the two-year service contract.  Had AT&T allowed consumers to

26   buy out of the contract for $175, it would have incurred a certain loss on every device.  So AT&T

27   did not allow that.  It refused to release unlock codes for the iPhones at all relevant times—and

28   told consumers on its website and elsewhere that it would not do so.  In fact, the evidence is that

around 14 million iPhones were sold prior to the launch of the iPhones purchased by Plaintiffs Ward and Buchar, and *AT&T did not unlock a single one* for use on T-Mobile.  AT&T held consumers to their two-year commitments.

*Unlocking:*  AT&T's unlocking policies were also readily knowable, and known, throughout the class period.  Cellular carriers today sell "unlocked" phones, typically at a much higher price than the subsidized price at which they sell phones along with a two-year contractual commitment.  However, during the alleged class period the sale of "unlocked" phones was relatively uncommon[8] and AT&T actively publicized the fact that it would *not* unlock the iPhone.  AT&T's website included this information, and its sales and customer service representatives told customers that the iPhone would not be unlocked.  Apple made similar announcements.  The mainstream press reported the same.  *See* Section IV.D, *supra*.

Finally, it must be emphasized that Plaintiffs' counsel here filed *iPhone I* in 2007, making *precisely* the same allegations that there was a failure to disclose the duration of the exclusivity agreement and the fact that the iPhone would not be unlocked.  This surely establishes that this aftermarket restriction was reasonably discoverable to consumers in this later, *third* case's alleged class period.[9]  Indeed, Professor Areeda explains that where "the relevant information [regarding an aftermarket restriction] is published in trade journals or newsletters, is widely known within the industry, or is available from rivals," the law *presumes* that a consumer knows of these restrictions.  Areeda ¶ 1740d4.

On a summary judgment record, where unfounded allegations count for nothing, this issue is crystal clear.  No reasonable juror could find that AT&T's exclusive rights and unlocking

---

[8] Class action litigation challenging cellphone locking on various grounds was pending as the iPhone was first launched.  *See e.g., Gatton v. T-Mobile USA, Inc.,* 152 Cal. App. 4th 571, 577 (2007) (discussing the "Handset Locking Case").  The practice was anything but secret.

[9] Publicly filed complaints are presumed under the law to be information that is available in the market, especially where that information is pertinent to plaintiffs bringing suit.  *See Staehr v. The Hartford Fin. Servs.,* 547 F.3d 406, 435 (2d. Cir. 2008) (the filing of previous lawsuit containing similar key allegations triggers inquiry notice); *see also LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 155 (2d Cir. 2003); *Landow v. Wachovia Secs.*, LLC, 966 F. Supp. 2d 106, 119 (E.D.N.Y. 2013).  That these cases discuss inquiry notice in the context of a statute-of-limitations defense is of no consequence because there is no reason why the principle underlying the inquiry notice rule in these cases should not apply in the context of "reasonable discoverability" of *Kodak* aftermarkets.

policies were unknowable.  They were not the least bit secret, ever, but certainly not by 2009.
Thus, even if one presumes incorrectly that voice and data services for the iPhone is an
aftermarket, it is still not a relevant antitrust market.

>    2.    *Newcal* **Does Not Support Plaintiffs' Theory That Aftermarkets Exist**
>          **Whenever Consumers Do Not Explicitly Consent to a Practice**

The Ninth Circuit's decision in *Newcal*, which addressed the aftermarket paradigm
analyzed in *Kodak*, is entirely consistent with these holdings.  *Newcal* involved similar, albeit
more extreme, facts to those in *Kodak*.  IKON, a competitor with Newcal in both the primary
market for copier equipment leases and aftermarket for copier equipment upgrades, allegedly
engaged in a "scheme to defraud" its own customers by amending its customers' lease agreements
and service contracts while "deliberately mislead[ing]" the customers to believe that the
amendments would not affect the original contract terms.  513 F.3d at 1043-44.  Newcal alleged
that the purpose of IKON's surreptitious amendments was to monopolize the aftermarket for
equipment upgrades and lease-end services.  *Id.*  In other words, *after* the initial purchase, IKON
took affirmative, fraudulent steps to attempt to exploit its locked-in customers.  *Id.* at 1050.

Despite these contentions—which on their face indicate unforeseeable anticompetitive
activity arising in an aftermarket—the case had been dismissed on a finding that "the boundaries
of [Plaintiffs'] markets impermissibly depended on a contractually-created group of consumers,"
*id.* at 1046, a concept which the district court traced to *Queen City Pizza v. Domino's Pizza*, 124
F.3d 430, 433-34 (3d Cir. 1997),  and *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997)).
The Ninth Circuit thus surveyed *Kodak* and its progeny, seeking to determine whether a
"contractually-created group of consumers" precludes a relevant aftermarket.  *Id.* at 1047-50.

The Ninth Circuit's answer was that in cases such as *Queen City Pizza,* where *in primary
market transactions* antitrust plaintiffs have contractually agreed to the restrictive terms that they
later challenge, the primary market is always the relevant market.  However, a contractually-
created group of consumers *may* constitute an aftermarket in other circumstances, depending on
whether the requirements of the *Kodak* doctrine are met.  *Id.* at 1048-49.

1    The court then found that the plaintiffs' alleged markets were cognizable aftermarkets

2  under *Kodak*.  First, the alleged markets were true aftermarkets since the "the market for

3  replacement copiers and lease-end services would not exist without the market for copier leases

4  and copier services" and the alleged monopolist "obtains the flex agreements only *after* obtaining

5  an initial lease or contract." *Id.* at 1049-50 (emphasis added).  Second, fraudulent conduct blinded

6  consumers from anticipating the aftermarket restraint in the primary market.  *Id.* at 1050

7  ("IKON's fraud and deceit … prevent consumers from realizing that their choice in the initial

8  market will impact their freedom to shop in the aftermarket").  Third, the *Newcal* plaintiffs' case

9  was "not a case in which the alleged market power flows from contractual exclusivity."  *Id.*

10  "Rather, [IKON] is leveraging a special relationship with its contracting partners to restrain trade

11  in a wholly derivative aftermarket."  *Id.*

12    Plaintiffs' case clearly fails in comparison to *Newcal*, yet somehow they discern from the

13  Ninth Circuit's decision a rule that unless the defendant has obtained consumers' contractual

14  consent to a restrictive practice, there is *ipso facto* a relevant aftermarket.  That is practically the

15  opposite of what *Newcal* holds.  The Ninth Circuit explained that the ordinary "economic

16  presumption" is that aftermarket power is constrained by competition in the primary market

17  because "consumers make a knowing choice to restrict their aftermarket options when they decide

18  in the initial (competitive) market" to purchase a product in the primary market that restricts their

19  later choices.  *Id.* at 1050.  All that is required for the presumption to be confirmed is evidence

20  that consumers are able to "reasonably discover" the aftermarket restrictions in question prior to

21  becoming locked-in.  *Id.* at 1048.  The case of contractual consent is a limit case:  no one will be

22  heard to argue that they could not have reasonably discovered what they agreed to by contract.

23  But under *Newcal*, whenever and however consumers are able to reasonably discover the

24  restrictive practice, that operates as "the functional equivalent of a contractual commitment," in

25  which case the aftermarket is not the relevant aftermarket.  *Id.* at 1049.  That principle ends this

26  case.

27

28

1

2

        **D.**      **There is No Evidence That iPhone Consumers Paid Higher-Than-Market Prices For Voice and Data Services, as Required Under the *Kodak* Doctrine.**

3

       The ultimate issue in the *Kodak* aftermarket analysis is whether the aftermarket has become

4

disassociated from the primary market, allowing the alleged monopolist—despite whatever

5

primary market competition it faces—to exercise the "power over price" that is the very definition

6

of monopoly power.  *See* Areeda ¶ 501.  In *Kodak*, the Supreme Court repeatedly emphasized the

7

fact that, after excluding rivals, Kodak raised service prices to its locked-in customers.  *Kodak*, 504

8

U.S. at 469, 477.  Post-*Kodak* decisions have thus held that "an antitrust plaintiff cannot succeed

9

on a *Kodak*-type theory where the defendant has not . . . exacted supracompetitive prices by

10

implementing a restrictive anticompetitive change of policy[.]"  *Metzler,, SPX*, 19 F. Supp. 2d at

11

1353.

12

       Here, there is no evidence of any post-lock-in price increase by AT&T.  In this competitive

13

market, a price increase, or a significantly higher price for a service contract on an iPhone as

14

opposed to competing devices, would be highly visible.  Yet Plaintiffs have neither alleged nor

15

offered evidence that AT&T charged higher prices for iPhone service than it charged with respect

16

to any other smartphone.  In fact, AT&T could not do that, ████████████████████

17

████████████████████████████████████████████████

18

████████████████  This mechanism ensured that iPhone customers enjoyed all of the benefits

19

of inter-carrier competition.  There is no basis for concluding that iPhone service became

20

disassociated from the broader wireless services market under these conditions.

21

**VII.**    **CONCLUSION**

22

       Since Plaintiffs cannot prove a cognizable relevant aftermarket, Apple respectfully requests

23

that the Court grant its motion for summary judgment.

24

Dated:  February 2, 2016                 Respectfully submitted,

25

                               LATHAM & WATKINS LLP

26

                               By /s/ Christopher S. Yates
                                   Christopher S. Yates

27

28

                               *Attorneys for Defendant Apple Inc.*