UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ZACK WARD, ET AL.**, <br><br>  Plaintiffs, <br><br> v. <br><br> **APPLE INC.**, <br><br>  Defendant. | Case No.  12-cv-05404-YGR <br><br> **ORDER GRANTING IN PART DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. Nos. 78, 126 |

Plaintiffs Ward and Buchar bring this putative class action against defendant Apple Inc. alleging violations of Section 2 of the Sherman Act for a conspiracy to monopolize trade in the market for iPhone voice and data services.  (Dkt. No. 1, "Comp.")

On December 15, 2015, the Court denied Apple's motion to dismiss, but indicated that it would entertain a motion for summary judgment solely on the issue of the existence of a relevant market for antitrust purposes.  (Dkt. No. 72.)  Apple filed such motion on February 2, 2016.  (Dkt. No. 78.)  The Court heard oral arguments on the motion on March 29, 2016, and ordered the parties to conduct additional discovery, deferring ruling thereon.  (Dkt. Nos. 97, 100.)  With the benefit of additional discovery, the parties filed supplemental briefs in September and October of 2016.  (Dkt. Nos. 112, 118.)[1]

---

[1] On November 21, 2016, plaintiffs filed an administrative motion to supplement the summary judgment record and file a sur-reply.  (Dkt. No. 126.)  Having considered such motion, and for good cause appearing, the Court **GRANTS** plaintiffs' administrative motion.

Having considered the pleadings, the papers and exhibits submitted on the motion, and oral arguments held on January 31, 2017, and for the reasons set forth more fully below, the Court finds that plaintiffs have raised sufficient facts to show the existence of an antitrust market, albeit more narrow than plaintiffs contemplate. Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Apple's motion for summary judgment.[2]

**I.   BACKGROUND**

Plaintiffs seek to represent a class of persons who purchased iPhones and paid for voice and data service from AT&T between October 19, 2008 and February 3, 2011 (the "Class Period"). Plaintiffs bring a single claim against Apple under Section 2 of the Sherman Act, alleging that Apple conspired with AT&T to monopolize an aftermarket for iPhone voice and data services. For purposes of the instant motion, Apple contends that no such illegal antitrust aftermarket exists under applicable laws and economic theories. The following undisputed facts are relevant to such argument and plaintiffs' claims to the contrary:

Apple launched its original cellular telephone, the iPhone 2G, on June 29, 2007. (Dkt. No. 83-8, Fenger Decl. ¶ 8.) Prior to such launch, Apple and AT&T entered into an agreement by which AT&T would be the exclusive provider of cellular voice and data service for the iPhone in the United States (the "Agreement"). (*Id.* at ¶ 9.)[3] By the terms of the Agreement, the exclusivity period was to end five years after the effective date of the Agreement, i.e. August 10, 2011. (Dkt. No. 83-9 at 2, 5.) The Agreement also allowed either party to terminate the Agreement for convenience and upon notice, prior to the second anniversary of the iPhone's commercial launch. (*Id.* at 19.) Thus, given that the iPhone's commercial launch was June 29, 2007 (Fenger Decl. ¶ 8), AT&T was only guaranteed to be the exclusive provider for the iPhone until June 29, 2009.

---

[2] In connection with the parties' filings on this motion, they submitted administrative motions to file parts of their briefs and certain exhibits under seal. (Dkt. Nos. 83, 90, 111, 117, and 125.) The Court addresses each of those motions by separate order.

[3] During the periods relevant to the instant action, similar exclusivity provisions between cellular phone manufacturers and service and data providers were common in the industry, at least for limited periods of time. (*See* Fenger Decl. ¶¶ 2–3; Dkt. No. 111-8, Wilkie Decl. ¶ 27.)

In June 2008, around the time the second generation of iPhones was being released (the iPhone 3G), Apple and AT&T modified the Agreement to include a different and specific termination date, namely December 31, 2010. The amendment to the Agreement also provided for a significant change to the manner in which Apple earned revenues from the sales of the iPhone. Under the original Agreement, Apple shared in the revenues earned by AT&T from its sales of voice and data service for iPhones. (Dkt. No. 83-9 at 6–7.) The amendment eliminated revenue sharing and replaced it with a subsidy model, through which AT&T agreed to subsidize the cost of the iPhone if the buyer agreed to enter into a two-year service contract. (Dkt. No. 83-10 at 3–5.)[4]

Prior to, and during the Class Period, Apple and AT&T advertised both that AT&T would be the exclusive provider of voice and data service for the iPhone (at least in the United States) and that consumers were required to purchase a two-year contract with AT&T to activate the iPhone. (Dkt. No. 80-1 at 2.) Such information also appeared in the following: (i) the box in which the iPhone was sold (Dkt. No. 80-2 at 2); (ii) certain websites related to Apple and AT&T (Dkt. No. 120-4); and (iii) a pop-up screen during the iPhone activation process (Dkt. No. 79-1 at 3). In light of these disclosures and the subsidy model in place during the Class Period, the iPhone was essentially sold bundled together with a two-year service plan through AT&T.[5] Relevant here, the two-year service plan contracts entered into between consumers and AT&T allowed consumers to terminate their plans with AT&T upon payment of a $175 termination fee. (Dkt. No. 82-3 at 11.) Additionally, in such a case, the contract allowed AT&T to recover "any handsets and accessories purchased with" the service plan. (*Id.*)

---

[4] During the Class Period, the parties agree that such a subsidy model was the industry standard by which "virtually all cellular phones" have been sold in the United States. (Dkt. No. 111-6 at 7, Issue 1, Fact 17.)

[5] Plaintiffs submitted evidence suggesting that, at least in some circumstances, gaps existed between when consumers purchased an iPhone and when they activated or purchased AT&T service for the same. (*See*, *e.g.*, Dkt. No. 111-2 at 2 (indicating that the average delay between purchase and activation for iPhones from June through September 2007 was two days).) However, for the reasons stated herein, the Court finds such gaps irrelevant for the purposes of determining whether a relevant antitrust market exists for iPhone voice and data services.

1  Notwithstanding the foregoing, plaintiffs have also produced evidence suggesting that the
2  unlock codes for the iPhones, necessary to enable the iPhone's use with other carriers, were not
3  released by AT&T until April 2012.  (Dkt. No. 113-9 at 2.)  Notably, until the exclusivity
4  agreement formally ended in December 2010, iPhones were produced to function only on the
5  Global System for Mobile communication network ("GSM").  (Fenger Decl. ¶ 7.)  At the time,
6  two major United States networks existed for cellular service, namely the GSM network and the
7  Code Division Multiple Access network ("CDMA").  (*See* Dkt. No. 111-8, Wilkie Decl. at ¶¶ 10–
8  11.)  During the Class Period, generally, phones built to operate on the GSM network were limited
9  to AT&T or T-Mobile as providers while those built to operate on the CDMA network were
10  limited to using either Sprint or Verizon.  (*Id.*)  Thus, some evidence suggests that consumers who
11  purchased a GSM-compatible iPhone prior to December 31, 2010 still had to remain on the AT&T
12  network until April 2012, or else purchase a new phone.[6]  Additionally, an open factual question
13  remains as to whether iPhone purchasers were aware that AT&T and Apple would refuse to
14  unlock their phones for purposes of international travel.[7]

## II.  LEGAL FRAMEWORK FOR SUMMARY JUDGMENT

Summary judgment is appropriate when no genuine dispute as to any material fact exists
and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party
seeking summary judgment bears the initial burden of informing the court of the basis for its
motion, and of identifying those portions of the pleadings, depositions, discovery responses, and

---

[6] A dispute of fact exists as to whether the GSM-compatible iPhones could fully operate on the T-Mobile network during the Class Period.  However, such dispute is not material to the Court's ruling on Apple's motion, and thus, the Court need not address the same at this time.  (*See* Dkt. No. 111-6 at 3, Issue 1, Fact 6.)

[7] In this regard, Dr. Wilkie opined thus:  "Cellular carriers, including ATTM, customarily unlock a GSM phone when a customer travels overseas.  This allows customers to replace the SIM card with a card from a local cellular carrier and thus avoid international roaming fees.  However, ATTM has refused to unlock iPhones.  Consumers who paid anticompetitive foreign roaming charges to ATTM suffered a common impact.  I understand that ATTM has developed a methodology that it has used to compensate some iPhone customers who have paid such foreign roaming charges.  I anticipate that, following further discovery, I will be able to evaluate ATTM's methodology and determine how many iPhone customers have been partially or fully compensated by ATTM so that I can calculate the economic damages resulting from ATTM's anticompetitive roaming charges."  (Dkt. No. 111-8, Wilkie Decl. ¶ 70.)

4

1 affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v.
2 Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the
3 case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of *some*
4 alleged factual dispute between the parties will not defeat an otherwise properly supported motion
5 for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id*. at
6 247–48 (dispute as to a material fact is "genuine" if sufficient evidence exists for a reasonable jury
7 to return a verdict for the non-moving party) (emphases in original).

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the opposing party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that the opposing party lacks evidence to support its case. *Id*. If the moving party meets its initial burden, the opposing party must then set out "specific facts" showing a genuine issue for trial in order to defeat the motion. *Id*. (quoting *Anderson*, 477 U.S. at 250). The opposing party's evidence must be more than "merely colorable" and must be "significantly probative." *Anderson*, 477 U.S. at 249–50. Further, that party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows a genuine issue of material fact exists for trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000); *Nelson v. Pima Cmty. College Dist.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute"); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("conclusory allegations unsupported by factual data are insufficient to defeat [defendants'] summary judgment motion").

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). However, in determining whether to grant or deny summary judgment, a court need not "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

1  (internal quotations omitted).  Rather, a court is entitled to "rely on the nonmoving party to
2  identify with reasonable particularity the evidence that precludes summary judgment." *See id.*;
3  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district
4  court need not examine the entire file for evidence establishing a genuine issue of fact, where the
5  evidence is not set forth in the opposing papers with adequate references so that it could
6  conveniently be found."). Ultimately, "[w]here the record taken as a whole could not lead a
7  rational trier of fact to find for the nonmoving-party, there is no genuine issue for trial."
8  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation
9  omitted).

### III. ANTITRUST AFTERMARKETS UNDER *KODAK* AND *NEWCAL*

To prove a conspiracy to monopolize in violation of Section 2, plaintiffs must prove four elements: "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). Additionally, plaintiffs must prove both that a "relevant market exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). Here, plaintiffs assert that the "relevant market" is the aftermarket for iPhone voice and data services, arguing that Apple's undisclosed exclusivity arrangement with AT&T illegally created a monopoly in the same.  (Dkt. No. 90-4 at 7.)

Plaintiffs' claims emanate from the Supreme Court's watershed decision in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), which created a new avenue for plaintiffs to allege a relevant antitrust market.  In *Kodak*, the Supreme Court addressed the juxtaposition of a defendant's market power in the primary equipment market, or lack thereof, with the possibility of market power in derivative aftermarkets.  *Id.* at 455.  The Supreme Court held that competition in the primary equipment market does not necessarily preclude antitrust liability in certain circumstances for derivative aftermarkets.  *Id.* at 471.

The markets addressed in *Kodak* involved the following: (i) a primary market for photocopiers and micrographic equipment and (ii) a derivative aftermarket for service and

1   replacement parts for such equipment.  *Id.*  With respect to the latter, beginning in the early 1980s,

2   independent service organizations ("ISOs") unrelated to the Eastman Kodak Company began

3   repairing and servicing Kodak equipment.  *Id.* at 457.  However, in the late 1980s, Kodak

4   implemented a new policy in which it would only sell replacement parts for its machines to

5   "buyers of Kodak equipment who use Kodak service or repair their own machines," effectively

6   eliminating ISO competition in the service aftermarket.  *Id.* at 458.  The ISOs filed suit against

7   Kodak claiming that it had "unlawfully monopolized and attempted to monopolize the sale of

8   service for Kodak machines."  *Id.*

9     The district court granted summary judgment in favor of Kodak and the Ninth Circuit

10  reversed holding that Kodak had "sufficient economic power in the tying product market [parts] to

11  restrain competition appreciably in the tied product market [service]."  *Id.* at 460.  The Ninth

12  Circuit further held that it was enough that the ISOs had "presented evidence of actual events from

13  which a reasonable trier of fact could conclude that . . . competition in the [equipment] market

14  does not, in reality, curb Kodak's power in the parts market."  *Id.*  On appeal, the Supreme Court

15  acknowledged that the tying arrangement alleged in the complaint could be a violation of the

16  antitrust laws if the "seller has 'appreciable economic power' in the tying product market and if

17  the arrangement affects a substantial volume of commerce in the tied market."  *Id.* at 462.  Kodak

18  did not dispute that its arrangement affected a substantial volume of interstate commerce but

19  argued that (i) its activities were not a tying arrangement and (ii) in any event, it did not exercise

20  appreciable economic power in the tying market.  *Id.*

21    The second of these arguments is most relevant to the instant motion.  Kodak contended

22  that it could not exercise the necessary market power for a Sherman Act violation because

23  competition existed in the equipment market.  *Id.* at 465.  Specifically, Kodak argued that any

24  exercise of market power in the market for parts and service "at least would be offset by a

25  corresponding loss in profits from lower equipment sales as consumers began purchasing

26  equipment with more attractive service costs."  *Id.* at 466.  The Supreme Court held that, as a

27  matter of law, the "fact that the equipment market imposes a restraint on prices in the aftermarket

28  by no means disproves the existence of power in those markets."  *Id.* at 471 (holding that there "is

7

no immutable physical law—no 'basic economic reality'—insisting that competition in the equipment market cannot coexist with market power in the aftermarkets").

The Supreme Court thus proceeded to the narrower question of whether, under the circumstances in *Kodak*, the assertion of power in the aftermarket was unreasonable. *Id.* Kodak's central theory was that higher service prices would lead to a drop in equipment sales. *Id.* at 472. However, the evidence in the record revealed otherwise. The Supreme Court found persuasive the ISOs' explanation that the existence of "significant information and switching costs" could "create a less responsive connection between service and parts prices and equipment sales," thus allowing Kodak to exercise market power in the former even where competition existed in the latter. *Id.* at 473 (explaining that for the "service-market price to affect equipment demand, consumers must inform themselves of the total cost of the 'package'—equipment, service, and parts—at the time of purchase; that is, consumers must engage in accurate lifecycle pricing").

With regard to information costs, the Supreme Court explained: "Given the potentially high cost of information and the possibility that a seller may be able to price discriminate between knowledgeable and unsophisticated consumers, it makes little sense to assume, in the absence of any evidentiary support, that equipment-purchasing decisions are based on an accurate assessment of the total cost of equipment, service, and parts over the lifetime of the machine." *Id.* at 475–76. With regard to switching costs, the Supreme Court stated that a "seller profitably could maintain supracompetitive prices in the aftermarket if the switching costs were high relative to the increase in service prices, and the number of locked-in customers were high relative to the number of new purchasers." *Id.* at 476. On such bases, the Supreme Court held that there was a question of fact "whether information costs and switching costs foil the simple assumption that the equipment and service markets act as pure complements to one another." *Id.* at 477.

The Supreme Court's decision in *Kodak* thus created the framework within which courts have addressed antitrust liability in the context of derivative aftermarkets. The Ninth Circuit grappled with the same in analyzing the existence of a relevant antitrust aftermarket in *Newcal*. There, parties leased name-brand copier equipment to commercial customers and also provided service "contracts for the maintenance of that equipment during the term of the lease." *Id.* at 1043.

8

1   The plaintiff in *Newcal* alleged that the defendant exercised illegal market power over the aftermarket for lease-end service contracts by amending "customers' lease agreements and service contracts without disclosing that the amendments would lengthen the term of the original contract." *Id.*

The district court dismissed the action, finding that the plaintiff had failed to allege a relevant antitrust market, and the Ninth Circuit reversed. *Id.* at 1044. In so reversing, the Ninth Circuit acknowledged three antitrust principles: First, "the law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue." *Id.* at 1048. Second, antitrust claims cannot rest on "market *power* that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant." *Id.* (emphasis in original).[8] Third, given the law allows an "inquiry into whether a consumer's selection of a particular brand in the competitive market is the functional equivalent of a contractual commitment," the analysis should center on whether such consumers entered into certain transactions "knowing that they were agreeing to such a commitment." *Id.*at 1049.

Against this legal framework, both parties cite approvingly to an article published not long after the Supreme Court's decision in *Kodak*, which lays out four different economic circumstances in which an antitrust market could manifest. *See* Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of* Kodak, 63 Antitrust L.J. 483 (Winter 1995). Of particular relevance to the situation at bar is Shapiro's "surprise" theory of antitrust aftermarkets.[9] "The surprise theory starts from the assumption that buyers in the aftermarket are vulnerable, and asks whether the equipment manufacturer will find it profitable to unexpectedly change its policies so as to exploit them." *Id.* at 488. Shapiro explains that under this theory, injury would occur if

---

[8] The Ninth Circuit in *Newcal* acknowledges that where "alleged market power flows from contractual exclusivity," an antitrust aftermarket is not created. *Id.* at 1050 (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) and *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997)). Apple, however, concedes that it does not fall under *Newcal*'s safe harbor for contractually created rights. Thus, the Court does not address such issues further.

[9] The parties have not focused on the other three theories: (i) costly information; (ii) limited manufacturer commitment; and (iii) price discrimination.

9

1  "buyers had anticipated or relied on competitive aftermarkets, but some change in the

2  manufacturer's policies blocked that competition." *Id.*

3  Thus, with this background in mind, the Court turns to an analysis of whether the particular

4  circumstances surrounding sales of the iPhone and purchasing service from AT&T during the

5  proposed Class Period gave rise to an antitrust aftermarket, and if so, to what extent.

**IV.  DISCUSSION**

To assert a relevant antitrust market in the secondary market, plaintiffs first argue the existence of a separate and distinct secondary market. Said differently, plaintiffs claim that the primary purchase of the iPhone created a locked-in base of consumers who were then forced to purchase iPhone voice and data services from AT&T, i.e. the secondary market.[10] To support this argument, plaintiffs claim, as they must, that the purchase of the iPhone and the service contracts were temporally distinct transactions.

The Court disagrees. To the extent any temporal disconnect existed between the purchase of the iPhone and the activation of AT&T services, the Court finds the period insignificant.[11] Although some buyers may not have activated their iPhone and AT&T service for several days after purchasing the iPhone, the purchase of the initial two-year contract was essentially linked to the purchase of the iPhone. Apple produced several pieces of evidence indicating that a minimum "new two-year wireless service plan with AT&T" was "required to activate all iPhone features, including iPod features." (Dkt. No. 80-2 at 2; *see also* Dkt. No. 79-1 at 3.) Plaintiffs themselves were aware when they purchased their iPhones that they also had to enter into a service agreement with AT&T. (Dkt. No. 126-2, Ward Dep. Tr. 68:19–69:11; Dkt. No. 126-3, Buchar Dep. Tr.

---

[10] Plaintiffs further argue that an aftermarket was also created by Apple and AT&T's refusal to unlock the iPhone during the two-year contract after users paid a termination fee. However, given the evidence of disclosures and information available to the consumers surrounding the sale of the iPhone, and the subsidy model in effect during the Class Period, the Court is not persuaded. Consumers explicitly locked themselves into a two-year agreement with AT&T, knowing that the same would be required to utilize the cellular capabilities of the iPhone. Additionally, the two-year service contract with AT&T included a provision that consumers may have to return their handsets should they terminate the plan prematurely.

[11] Plaintiffs note that discovery documents revealed that the average delay between purchase of the iPhone and activation of AT&T services was 1.5 days.

10

1    16:15–17:12.) Thus, at least with respect to the initial two-year agreement with AT&T, no

2    evidence has been proffered that a "surprise" existed leading to a market hostage to defendant.

3    Information regarding the need to purchase a two-year AT&T service plan was widely known, and

4    plaintiffs have put forward no evidence to the contrary. *See, e.g.*, *Newcal*, 513 F.3d at 1049

5    (finding that the primary product market included the equipment lease and initial service contract

6    and that the secondary product market consisted of the replacement equipment and lease-end

7    service contracts).

8          Plaintiffs next argue that where, as in *Newcal*, the sales are tied, a market existed because

9    of the "surprise" caused by the existence of a secret, five-year exclusivity agreement between

10   Apple and AT&T. Plaintiffs' first expert, Dr. Simon Wilke, opined as part of the initial opposition

11   to Apple's motion for summary judgment that this surprise effectively locked-in "iPhone

12   customers for a substantial period beyond the term specified in their agreements with [AT&T]."

13   (Dkt. No. 111-10 at 4, ¶¶ 2, 8 (finding that "iPhone customers did not agree at the time they signed

14   the service contract with [AT&T] to make [AT&T] their exclusive iPhone carrier for a period of

15   time extending beyond the two-year term of that contract"); *see also* Dkt. No. 111-8 at 21, ¶ 33

16   (describing that the market power could be exercised by "withholding information regarding the

17   five-year term of the Apple/[AT&T] agreement, thereby causing iPhone customers who entered

18   into two-year agreements to either (1) stop using their iPhones for telecommunications purposes,

19   or (2) continue to use [AT&T] after their two-year agreement expired, effectively locking in

20   iPhone customers for a substantially longer period").) Discovery has undermined plaintiffs'

21   theory. The evidence now shows that the "five-year exclusivity deal" between Apple and AT&T

22   never materialized. Summary judgment on this theory is therefore appropriate.

23         Given the lack of evidence, plaintiffs' replacement expert, Dr. Frederick Warren-Boulton,

24   adds nothing to plaintiffs' arguments based on the five-year exclusivity theory. However, he does

25   offer an additional theory that a market existed *after* the expiration of the two-year contract. (*See*

11

1  Dkt. No. 114-1 at 12, ¶ 11.)[12] With respect to this claim, plaintiffs have submitted evidence showing that defendant may have manipulated a market for service plans where defendant failed or refused to unlock the phones after the expiration of the two-year commitment for either domestic or international use.  (*See* Dkt. No. 113-9 at 2.)[13]

The Court agrees as to this more narrow theory.  Even though Apple was no longer bound to create iPhones that could only function on the GSM network after 2010, those who purchased iPhones prior to the end of exclusivity still had to remain on the GSM network.  These consumers could have expected to switch to another GSM provider, like T-Mobile, at the end of the two-year contract with AT&T.  However, as plaintiffs' evidence suggests, AT&T did not begin providing unlock codes for such phones until April 2012.  Consequently, these consumers would have been locked into renewing AT&T service, or else lose the cellular capabilities of their iPhones.  In this context, the Court **DENIES** summary judgment with regard to any such claims.

Finally, the Court addresses Apple's argument that summary judgment should be granted generally and as a matter of law based solely on the failure to include all economic substitutes in the market definition.  The Court disagrees.  *Newcal* held the law "permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue."  *Newcal*, 513 F.3d at 1048.  In evaluating the market at issue, courts look to various factors.  No one factor is dispositive.  *See Red Lion Medical Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1231–32 (E.D. Cal. 1999) (finding that a policy change is not necessarily required to sustain an aftermarket antitrust claim).

In summary, the Court finds that with regard to the sale of the iPhone and the purchase of the initial two-year service plan with AT&T, there is no relevant antitrust aftermarket.

---

[12] Dr. Warren-Boulton also suggests that a lock-in is created for consumers who believed they could terminate their contract with AT&T and transfer to another carrier after paying a termination fee.  However, for the reasons previously discussed, such argument does not persuade.

[13] As previously discussed, there also appears to be a question as to whether consumers were aware that neither AT&T nor Apple would unlock their phones during the initial two-year contract for the purposes of international use.  Although plaintiffs have not sufficiently developed this argument, the Court recognizes that there may be viable claims in this regard.

12

1  Accordingly, with respect to that issue, the Court **GRANTS** summary judgment in favor of Apple.

2  With respect to the more narrow claims discussed herein, summary judgment is **DENIED**.

3  **V.    CONCLUSION**

4  As set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** Apple's motion for

5  summary judgment.  Thus, the case may move forward within the framework set forth in this

6  Order.

7  The Court further **SETS** a case management conference for **Monday, May 1, 2017** at **2:00**

8  **p.m.**  Parties shall file an updated case management conference statement.

9  This Order terminates Docket Numbers 78 and 126.

10  **IT IS SO ORDERED.**

11  Dated: March 22, 2017

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**