# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ZACK WARD, ET AL.,**<br><br>Plaintiffs,<br><br>vs.<br><br>**APPLE INC.,**<br><br>Defendant. | CASE NO. 12-cv-05404-YGR<br><br>**ORDER DENYING MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. No. 158 |

Now before the Court is plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3). (Dkt. No. 158 ("Motion").)[1] Plaintiffs seek class certification in connection with their claims against defendant Apple Inc., which they describe as "arising out of the undisclosed and unprecedented exclusivity agreements between Apple and AT&T Mobility LLC ('AT&T') which locked Plaintiffs and all other iPhone consumers into using AT&T's voice and data service, even after their wireless services agreements ('WSAs') with AT&T expired and even if they paid an early termination fee ('ETF') under the WSAs." (Motion at 1.) Defendant opposes. (Dkt. No. 174.)

Having carefully considered the papers submitted on the motion and oral arguments held on February 6, 2018, and for the reasons set forth below, the Court **DENIES** plaintiffs' motion.

**I.  RELEVANT BACKGROUND**

The facts of the case are well known to the parties and counsel of record. The background relevant to the instant motion is summarized as follows. On March 22, 2017, the Court granted in part and denied in part Apple's motion for summary judgment. (Dkt. No. 146.)[2] Based on certain

---

[1] The parties have filed various administrative motions to seal documents in connection with plaintiffs' motion. (*See* Dkt. Nos. 157, 173, 180.) The Court addresses each in a separate order.

[2] The Court partially granted summary judgment on the basis that AT&T's service during an iPhone customer's initial two-year contract period is not a cognizable aftermarket. The Court

evidence submitted by plaintiffs, the Court found:

> Even though Apple was no longer bound to create iPhones that could only function on the GSM network after 2010, those who purchased iPhones prior to the end of exclusivity still had to remain on the GSM network. These consumers could have expected to switch to another GSM provider, like T-Mobile, at the end of the two-year contract with AT&T. However, as plaintiffs' evidence suggests, AT&T did not begin providing unlock codes for such phones until April 2012. Consequently, these consumers would have been locked into renewing AT&T service, or else lose the cellular capabilities of their iPhones.

(*Id*. at 12.)

In light of the Court's summary judgment order, plaintiffs now allege that "[b]y locking the iPhones and refusing to give consumers the software codes needed to unlock them, Apple and AT&T unlawfully prevented iPhone customers from exercising their legal right to switch carriers." (Motion at 6.) Among other injuries, plaintiffs allege that iPhone consumers were unable to switch to a less expensive carrier and unable to use local carriers while traveling abroad, thus incurring "exorbitant roaming charges." (*Id*.)

Despite the passage of time and a trial date set for August 20, 2018, plaintiffs now offer an 11-page expert declaration of Dr. Frederick R. Warren-Boulton in support of class certification,[3] which purportedly shows that "there are established and reliable econometric methodologies available to prove antitrust impact and damages caused by Apple's alleged anticompetitive conduct on a class-wide basis." (*Id*. at 8.) Dr. Warren-Boulton's theories of impact and damages are based on the existence of two "but-for" worlds.[4] According to Dr. Warren-Boulton, the timing and nature of the harm to members of the class, as well as the methodology for estimating that harm, depends on the assumed but-for world. The Court summarizes each "but-for" world in turn.

The "Truthfully Exclusive" ("TE") World is a world in which Apple would have adequately informed prospective customers that neither it nor AT&T would unlock their iPhones

---

partially denied summary judgment on the basis that there was a triable issue as to a potential aftermarket for AT&T renewal service.

[3] Dr. Warren-Boulton is an economist and principal at Microeconomic Consulting & Research Associates ("MiCRA") in Washington, D.C.

[4] These are worlds that would have existed "but for" the alleged conspiracy between Apple and AT&T to monopolize the aftermarket for iPhone voice and data service.

2

when their initial service contracts with AT&T ended. In the TE World, Dr. Warren-Boulton posits that providing this information would have reduced consumers' willingness to pay, or "reservation prices" of iPhone purchasers, by an amount equal to the present value of the lower prices or higher quality on the service they could have expected to receive on their iPhones after the expiration of their initial service contracts. (Dkt. No. 159-19 ¶ 8 ("Warren-Boulton Decl.").)

On the other hand, the "Truthfully Non-Exclusive" ("TNE") World is a world in which Apple, upon request, would have agreed to unlock customers' iPhones at the end of their initial service contracts. Dr. Warren-Boulton postulates that the refusal of Apple and AT&T to unlock phones increased the total cost of ownership in the as-is world through higher prices or lower quality (or both) on the service received by iPhone purchasers. (*Id*.)

Beyond the two articulated theories, the expert's declaration is devoid of analysis. Instead, Dr. Warren-Boulton asserts that based on his preliminary review of certain data collected and techniques employed by Dr. Simon J. Wilkie in a separate litigation involving Apple, Dr. Warren-Boulton "do[es] not expect to encounter any insurmountable difficulty in applying [Dr. Wilkie's] techniques to form an estimate of harm to consumers" in the TE and TNE worlds. (*Id*. ¶¶ 22, 27.) Thus, according to Dr. Warren-Boulton, in both worlds "there exists a common methodology and data to reliably assess the existence and amount of damages to the Class members without the need for individual inquiry." (*Id*. ¶¶ 24, 29.)

## II. LEGAL FRAMEWORK

The Court assumes familiarity with Rule 23, and a brief review of the relevant standards will suffice for purposes of this Order. Under Rule 23(a), the Court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Where, as here, plaintiffs seek to qualify for certification under Rule 23(b)(3), a class must meet two additional requirements: Common questions must "predominate over any question affecting only individual members," and class resolution must be "superior to other available methods for the fair and efficient adjudication

3

of the controversy." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

"Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (internal quotation marks omitted). To prove a conspiracy to monopolize in violation of Section 2 of the Sherman Act, plaintiffs must prove four elements: "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). "[I]n the class action context, class certification is precluded where plaintiffs have not shown that the fact of injury element can be proven for all class members with common evidence." *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 165 (C.D. Cal. 2007).

## III. DISCUSSION

Apple does not dispute that plaintiffs have satisfied the threshold requirements of Rule 23(a) or the superiority requirement of Rule 23(b)(3). It contends only that the class definition is overbroad and that plaintiffs have not established predominance. Accordingly, the Court limits it discussion to Dr. Warren-Boulton's hypotheses and whether they support class certification.

In order to prove common antitrust impact, plaintiffs must "establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of Defendants' alleged anti-competitive conduct." *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 567 (N.D. Cal. 2013) (internal quotation marks omitted) (modifications in original). Some courts have stated that a court's inquiry on class certification should be limited to whether plaintiffs merely "intend" to present "generalized" evidence of antitrust impact. *See, e.g, In re Dynamic Random Access Memory ("DRAM") Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *9 (N.D. Cal. June 5, 2006). However, in *In re Graphics Processing Units Antitrust Litigation ("In re GPU")*, 253 F.R.D. 478 (N.D. Cal. 2008), the court explained that even under a plausible methodology standard, "certification [should not be] automatic every time counsel dazzle the courtroom with graphs and tables." *Id*. at 491. "[C]onducting a thorough review of Plaintiffs' theory and methodology is consistent with the requirement that the Court conduct a

4

'rigorous analysis' to ensure that the predominance requirement is met." *In re High-Tech*, 289 F.R.D. at 567 (citing *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1431 (2013)).

Here, the Court is unable to fulfill its obligation. Dr. Warren-Boulton's declaration is essentially lacking any data-driven analysis. Instead, he refers generically to an extant "common methodology and data," which he will supposedly use to "reliably assess the existence and amount of damages to the Class members." (Warren-Boulton Decl. ¶¶ 24, 29.) His failure to provide "properly analyzed, reliable *evidence* that a common method of proof exists to prove impact on a class-wide basis" is fatal. *In re High-Tech*, 289 F.R.D. at 570 (emphasis in original) (internal quotation marks omitted). Indeed, he has failed to submit any semblance of a "functioning model that is tailored to market facts in the case at hand." *In re GPU*, 253 F.R.D. at 492 (noting courts in the antitrust context are "increasingly skeptical of plaintiffs' experts who offer only generalized and theoretical opinions" that a particular methodology may be used to show class-wide impact and injury using common proof) (internal quotation marks omitted). Dr. Warren-Boulton's "but-for" world hypotheses offer only theories of impact and damages, and theory alone "is not sufficient to satisfy Rule 23(b)(3)'s requirements." *In re High-Tech*, 289 F.R.D. at 570. Absent a data-driven model, plaintiffs have failed to meet their "burden under Rule 23 to provide a viable method for demonstrating class-wide antitrust injury based on common proof." *In re GPU*, 253 F.R.D. at 497.[5]

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification is **DENIED**.

This Order terminates Docket Number 158.

**IT IS SO ORDERED.**

Dated: February 16, 2018

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[5] Because plaintiffs' deficiency with respect to antitrust injury is dispositive as to predominance, certification of the proposed Rule 23(b)(3) class is not possible. Accordingly, the Court declines to address the scope of the proposed class definition.

5